414 So.2d 1353 (1982)
Francis L. HUGHES, Plaintiff-Appellant,
v.
WEBSTER PARISH POLICE JURY, et al., Defendants-Appellees.
No. 14878.
Court of Appeal of Louisiana, Second Circuit.
May 10, 1982.
*1354 Jack, Jack, Cary & Cary by Paul Cary, Shreveport, for plaintiff-appellant.
Lunn, Irion, Switzer, Johnson & Salley by Jack E. Carlisle, Jr., Shreveport, for defendants-appellees.
*1355 Before HALL, JASPER E. JONES and FRED W. JONES, Jr., JJ.
JASPER E. JONES, Judge.
In this workers' compensation action plaintiff, Francis L. Hughes, appeals a judgment rejecting his demands for benefits for permanent total disability, medical expenses, interest, penalties and attorney's fees. The defendants are the Webster Parish Police Jury (sometimes hereinafter referred to as the "Jury") and its workers' compensation insurer, Commercial Union Assurance Company (sometimes hereinafter referred to as "Commercial Union").
This appeal presents two primary questions(1) is plaintiff entitled to workers' compensation benefits, and (2) if so, is he entitled to recover penalties and attorney's fees by reason of Commercial Union's termination of payments?
Hughes was employed as a mechanic in the Jury's vehicle barn. On November 8, 1977, plaintiff was attempting to install a clutch, pressure plate and throw-out bearing in a Jury vehicle. He was underneath the vehicle on a creeper when the clutch and pressure plate, which weighed approximately 40 lbs., fell on his chest and briefly pinned him beneath the vehicle.[1]
Immediately after the accident Hughes experienced extreme pain in the lower back, momentary blindness and he became very ill. Hughes sat and rested for approximately 30 minutes in hopes that he would begin to feel better, but when he did not he left work to see his personal physician, Dr. J. Wayne Sessions.
Hughes saw Dr. Sessions the afternoon of November 8, 1977. Upon examination of Hughes, Dr. Sessions found tenderness in the lumbosacral area and a decreased range of motion on forward and lateral bending. Dr. Sessions referred plaintiff to Dr. Donald F. Overdyke, an orthopedic surgeon.
Plaintiff first saw Dr. Overdyke on November 10, 1977. Dr. Overdyke examined Hughes and found tenderness of the lumbosacral region. He prescribed a back brace and thought appellant would be disabled for only 10 to 12 days.
Dr. Sessions saw Hughes on November 17, 1977, at which time he still regarded plaintiff as disabled.
Hughes returned, unimproved, to Dr. Sessions on November 26. Dr. Sessions advised him to continue his previous treatment of wearing the back brace, exercising and taking muscle relaxants. The same course of treatment was followed when Hughes returned to Dr. Sessions on December 2, 1977.
Hughes returned to Dr. Sessions on December 16. The doctor still considered plaintiff disabled and attempted to treat his back pain with injections of cortisone and an anesthetic.
After Hughes returned to Dr. Sessions on December 17, still no better, he was again referred to Dr. Overdyke. 1978
On January 5, 1978, Dr. Overdyke again saw plaintiff. Though Dr. Overdyke's examination showed his back to be healing, Hughes still complained of weakness, cramps and back pain. Dr. Overdyke prescribed a lumbosacral corset for Hughes and encouraged him to engage in as much physical activity as possible. Dr. Overdyke still considered Hughes disabled.
When Dr. Sessions saw plaintiff on January 6 and 27, he was still experiencing back pain. Dr. Sessions advised Hughes to continue following the regimen prescribed by Dr. Overdyke.
Hughes next saw Dr. Sessions on February 17. Hughes complained that he was worse, and on examination Dr. Sessions found a decreased range of motion on forward and lateral bending. Dr. Sessions diagnosed plaintiff's condition as acute lumbar strain and considered him disabled because of pain.
*1356 Upon returning to Dr. Sessions on March 10, plaintiff complained that he was no better. After examining Hughes, Dr. Sessions could not find a reason for his continued difficulty. He decided to refer Hughes to Dr. Thomas Edwards, an orthopedic surgeon who was an associate of Dr. Overdyke.
Dr. Edwards saw plaintiff on March 13. He examined Hughes and found him totally disabled because of chronic lumbosacral pain. Dr. Edwards felt plaintiff's prognosis was guarded. He recommended that Hughes do more back exercises in an effort to lessen his need for the back brace.
Hughes returned to Dr. Sessions on March 15 and 30. His complaints remained the same and again Dr. Sessions could not find objective symptoms to explain them. Dr. Sessions advised plaintiff to try to discontinue the use of the back brace as much as possible.
Plaintiff's condition was unchanged when Dr. Sessions saw him on April 27. Dr. Sessions still felt that plaintiff could not return to work and decided to again refer Hughes to Dr. Edwards. Hughes was unimproved when Dr. Sessions saw him on May 19.
On May 25, Hughes was seen by Dr. Thomas A. Norris, an orthopedic surgeon. Dr. Norris found that plaintiff was not ready to return to his job as a mechanic, but thought he might be able to do light work.
On June 14, Hughes returned to Dr. Sessions unimproved. Dr. Sessions continued the previous treatments.
Dr. Edwards saw plaintiff for the second time on July 5. Dr. Edwards found him no better, and possibly worse. It was his opinion that plaintiff was having so much difficulty that he could not do back exercises. Dr. Edwards believed that plaintiff's tension over his condition was contributing to his back problems. He felt that Hughes was still disabled; that his prognosis was very poor and the chances for his recovery grew more remote the longer his condition continued. Dr. Edwards recommended that plaintiff be evaluated at the Shreveport Pain and Rehabilitation Center.
Hughes was seen by Dr. Sessions on July 8 and 14. His condition was unimproved and the prior treatment was continued.
On July 17, 1978, plaintiff was admitted to the Shreveport Pain and Rehabilitation Center where he remained through July 21. At the Center physical and psychological evaluations of the plaintiff were performed.
The physical evaluation revealed only mild back spasm. After the psychological evaluation, psychiatric consultation was recommended, but plaintiff resisted that suggestion.
Dr. Phillip Osborne, director of the Center, testified that there were three possible diagnoses of plaintiff's condition (1) malingering, (2) psychophysiological musculoskeletal disorder and (3) hysterical neurosis conversion type. The primary diagnosis of the Center's team of professionals was hysterical neurosis conversion type. They felt the least likely of the three was malingering. Dr. Osborne expressed the opinion that a psychiatric evaluation was needed to determine which of the latter two diagnoses more correctly described plaintiff's condition.
Dr. Osborne considered plaintiff emotionally disabled and a poor candidate for treatment or vocational rehabilitation. Dr. Osborne also testified that because of plaintiff's low intelligence he was a poor prospect for psychotherapy.
Plaintiff saw Dr. Sessions on July 24, August 7 and August 21. There was no improvement in plaintiff's back condition but a change in medication did alleviate a problem he was having with side effects from his previous medication.
On September 5, 1978, Dr. Sessions prepared an attending physician's statement in which he listed plaintiff as totally and permanently disabled.
Dr. Sessions again saw Hughes on September 12. He was still no better and his previous treatment was continued. There was no change when Hughes saw Dr. Sessions on October 3 and 26.
There was no change in his condition when Hughes saw Dr. Sessions on November 15. On that date Dr. Sessions again *1357 advised Hughes to engage in as much physical activity as possible. Plaintiff was unimproved when he returned to Dr. Sessions on December 13.
1979
Dr. Sessions next saw Hughes on January 12, 1979. His condition was unchanged and Dr. Sessions still considered him disabled. Hughes was the same when he saw Dr. Sessions on February 8, March 8 and April 5.
Hughes was worse when he saw Dr. Sessions on May 3. He was unimproved at the time of his June 5 appointment with Dr. Sessions. His condition was the same when seen by Dr. Sessions on August 8.
Plaintiff returned to Dr. Sessions on October 2 and November 1 complaining of back and leg pain.
When Hughes next saw Dr. Sessions on November 29 there seemed to have been some improvement in his condition and Dr. Sessions recommended increased exercise to counter plaintiff's weakness.
1980
On January 24, 1980, Dr. Sessions found plaintiff's condition about the same. The prior treatment was continued.
On March 13 and 26 plaintiff was examined by Dr. William Kimbell, a psychiatrist. Dr. Kimbell was of the opinion that Hughes was in pain, but he was unsure how much of the pain related to physical and how much to emotional factors. It was Kimbell's opinion that plaintiff was disabled.
Dr. Kimbell gave three possible diagnoses for plaintiff's condition (1) psychophysiologic musculoskeletal reaction, (2) chronic lumbosacral strain, or (3) disc problems. He explained that psychophysiologic musculoskeletal reaction is a physical condition aggravated by emotional factors.
It was Dr. Kimbell's opinion that plaintiff's prognosis for returning to work was very poor. He also testified that Hughes was unsuitable for training for work other than manual labor.
Dr. Overdyke agreed with Dr. Kimbell's diagnosis of psychophysiologic musculoskeletal disorder and chronic lumbosacral strain. Dr. Osborne testified that a psychiatric diagnosis of psychophysiologic musculoskeletal disorder would be consistent with the Pain Center staff's findings.
Hughes returned to Dr. Sessions on April 30. Dr. Sessions still considered him disabled at that time. Dr. Sessions subsequently saw Hughes on August 5, September 30, October 2 and November 26, 1980, and did not find his condition improved on any of those occasions. He still considered Hughes disabled as of November 26.
Hughes received workers' compensation benefits from the date of his injury through December 4, 1979, when they were terminated by Commercial Union. Mr. Rogell W. Fortenberry, Commercial Union's Claims Manager in its Shreveport office, testified that benefits were terminated because of plaintiff's refusal to undergo rehabilitation, his lack of objective symptoms and "activity checks" which revealed conduct it regarded as inconsistent with the medical evidence.
The evidence established that before the injury upon which the suit is based, appellant enjoyed good health, with the exception of a minor back injury sustained while employed by the Jury in April 1977. He worked as an employee of the Department of Agriculture and as a truck driver. When laid off by his employer he worked as a trapper and "shade tree" mechanic. He planted a large garden each year and maintained a big lawn.
The record shows that after his injury plaintiff experienced numerous incidents of pain and problems with his back. He has been unable to do any work since his injury, he plants no garden and it takes him several days to mow his yard. However, Hughes has done some hunting, trapping and fishing since his injury.
Prior to his injury Hughes was an avid hunter, trapper and fisherman. Even after his injury he has attempted to pursue those activities as much as possible. However, plaintiff has been forced to greatly curtail his outdoor activities.
Before his injury Hughes' hunting trips often lasted all day. Now he never stays out more than three hours, and usually less. He also hunts in a much less vigorous way since the injury.
*1358 Now Hughes does most of his fishing from the bank rather than in a boat. This is so he can move around. Howard Beatty, a frequent outdoor companion of plaintiff, testified that Hughes could not remain in a boat for more than an hour before he would have to be returned to shore so he could move about to relieve his back discomfort.
Before his injury plaintiff's income from trapping was sometimes as high as $2,500 per year. In order to earn that level of income Hughes set as many as 100 traps in the remotest possible areas.
In 1980 Hughes had an income of only $111 from trapping. He was forced to stay very near roads and set few traps. He set what traps he did set on logs and clayroots so he would not have to bend or stoop.
Hughes stopped trapping with Beatty because he was unable to keep up well enough to keep from slowing Beatty. He began trapping with his 81-year-old father instead.
The very limited outdoor activities engaged in by plaintiff were not contrary to the recommendations of Drs. Sessions, Overdyke and Kimbell that he obtain as much exercise as he could compatable with his pain and disability.
The trial judge found that whatever disability plaintiff suffered was not caused by the accident of November 8, 1977, and that even if it had been, he would be barred from recovery by his failure to follow treatment and submit to rehabilitation and for these reasons rejected plaintiff's demands.
The plaintiff in a workers' compensation case bears the burden of proving his case by a preponderance of the evidence. Prim v. City of Shreveport, 297 So.2d 421 (La.1974).
If the medical evidence shows a reasonable possibility of a causal relationship between the plaintiff's accident and his disability, and he was in good health before the accident and shortly thereafter the symptoms of the disability appear and thereafter continuously manifest themselves, causation is presumed. Lucas v. Ins. Co. of North America, 342 So.2d 591 (La. 1977).
At oral argument and in brief appellees have attempted to characterize appellant as a malingerer who would rather draw compensation and pursue his outdoor interests than to return to work. The proof of such a contention requires positive and convincing evidence. Miller v. United States Fidelity and Guaranty Co., 99 So.2d 511 (La.App. 2d Cir. 1957). We find no such evidence in the record and, on the contrary, find that the record shows that Hughes was totally and permanently disabled under LSA-R.S. 23:1221(2).[2]
Every doctor was of the opinion that plaintiff was disabled. The record shows that Hughes is 49 years old, with only a 7th grade education. His pain disables him from doing manual labor and he is unsuitable for training to non-manual labor jobs. The trial judge was clearly wrong in failing to find plaintiff totally and permanently disabled.[3] See Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
We also find that plaintiff's disability was caused by the accident of November 8, 1977.
*1359 Hughes is a person of unusual emotional characteristics. It is true, as the trial judge found, that those characteristics preexisted the accident. However, an employer takes his employee as he finds him and an employee's disability is compensable when a non-disabling pre-existing condition is activated or precipitated into disabling manifestations as a result of injury. Crawford v. Al Smith P. & H. Services, Inc., 352 So.2d 669 (La.1977); Lucas, supra.
The record here shows that the injury Hughes suffered would have disabled most workers for only a few weeks. However, because of plaintiff's peculiar emotional make up this generally minor physical injury has operated to produce a permanent disability with both physical and emotional causes.
Hughes is entitled to the Lucas presumption that the accident and injury which occurred on November 8, 1977 caused his disability. Before the accident Hughes was in good health. Immediately after the accident Hughes began experiencing back pain which still disables him. This presumption of causation is unrebutted and the trial judge erred in not giving plaintiff its benefit.
Having found that Hughes is disabled and that his disability was caused by the accident of November 8, 1977, we now turn to the question of whether he is barred from recovery by his failure to follow treatment and to submit to rehabilitation. In so finding the trial judge relied on this court's opinion in American Home Assur. Co. v. Johnson, 373 So.2d 742 (La.App. 2d Cir. 1979).
American Home stands for the proposition that an employee may be barred from recovering compensation benefits when he has willfully and unreasonably refused or failed to follow a prescribed program of rehabilitation which is reasonably expected to rehabilitate him for work and the employer shows by clear, convincing and conclusive proof that the failure to follow treatment is the cause of the continuing disability.
Here the evidence shows that the reason appellant did not perform some of the prescribed exercises was that they were too painful. Dr. Edward testified that plaintiff's condition was such that he did not think Hughes could do back exercises. Plaintiff's failure to perform the exercises cannot be called willful or unreasonable.
Appellant also refused to submit to a rehabilitation program to be paid for by Commercial Union and administered by Ms. Rose Shempp. However, his recovery is not barred by that refusal.
There is no evidence that the offered rehabilitation program was designed to deal with disabilities, such as plaintiff's, which are at least partly psychological, nor that this program would have eliminated plaintiff's disability. Further, there is much evidence in the form of testimony by Drs. Edwards, Osborne, Kimbell and Sessions, that plaintiff was a poor prospect for rehabilitation. We also note that though plaintiff's chances for recovery grew more remote the longer his disability continued, Commercial Union did not offer the rehabilitation program to Hughes until fourteen months after the accident. The defendants have not shown by clear, convincing and conclusive proof that appellant's continuing disability is due to his failure to undergo the offered rehabilitation program.
The trial judge was clearly wrong in finding that appellant's recovery would be barred by his failure to follow treatment or submit to rehabilitation.
We now consider Commercial Union's liability for penalties and attorney's fees under LSA-R.S. 22:658.[4]
*1360 Whether or not the discontinuance of workers' compensation benefits is arbitrary and capricious depends primarily on the facts known to the employer or insurer at the time benefits are terminated.[5]Arthur v. McConnell, 286 So.2d 499 (La.App. 2d Cir. 1973).
The peculiar facts and circumstances of each case control whether penalties and attorney's fees should be awarded. Gauthier v. Employers National Insurance Co., 316 So.2d 769 (La.App. 1st Cir. 1975); writ refused 320 So.2d 911 (La.1975).
Penalties and attorney's fees should not be awarded when there are legitimate disputes as to the extent or cause of the claimant's disability. Perrin v. Hartford Accident & Indemnity Company, 248 So.2d 58 (La.App. 1st Cir. 1971); Webb v. Turbex Const. Co., 368 So.2d 789 (La.App. 2d Cir. 1979); Weller v. Brown, 398 So.2d 551 (La. App. 1st Cir. 1979).
The propriety of an award of penalties and attorney's fees is an extremely close question in this case. Appellant argues the penalties and attorney's fees should be awarded because at the time the insurer terminated his benefits he had not been released for work by any of the several doctors who had seen him. While it is true that the insurer had no releases from any doctor at the time it terminated benefits, it is also true that for quite some time before that appellant had not displayed any objective symptoms. We note that Dr. Kimbell did not examine appellant until March, 1980, four months after benefits were terminated. There is no indication that Commercial Union was informed of the results of those examinations until the trial. That Commercial Union was not notified of this information further negates appellant's attempted showing of arbitrary and capricious conduct by Commercial Union. The insurer also knew plaintiff was engaging in some hunting and trapping activities when it made the decision to terminate benefits.
The above mentioned factors, coupled with the fact that a disability of the nature of plaintiff's is a type that an unscrupulous claimant might attempt to feign, created a sufficient question of the extent and cause of plaintiff's disability to render Commercial Union's termination of benefits not arbitrary, capricious or without probable cause.[6] Appellant is not entitled to penalties and attorney's fees.
The judgment of the district court rejecting plaintiff's demands for workers' compensation benefits is reversed and judgment is rendered in favor of plaintiff, Francis L. Hughes, and against the defendants, Commercial Union Assurance Company and the Webster Parish Police Jury, in solido, for benefits for permanent total disability in the amount of $116 per week, commencing November 8, 1977, with credit for payments made through December 4, 1979, with legal interest on each payment from the date due until paid, together with medical expenses *1361 in the amount of $530.30 with legal interest from due date until paid, and for all costs.
The judgment as AMENDED is AFFIRMED.
NOTES
[1] It was stipulated that Hughes was employed by the Jury and the accident of November 8, 1977 occurred in the course and scope of his employment, and that if benefits are due the proper amount is $116 per week.

Commercial Union stipulated that there was coverage for any workers' compensation benefits owed.
[2] R.S. 23:1221Compensation shall be paid under this Chapter in accordance with the following schedule of payments:

. . . . .
(2) For injury producing permanent total disability of an employee to engage in any gainful occupation for wages, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee, at the time of injury, was particularly fitted by reason of education, training and experience, sixty-six and two-thirds per centum of wages during the period of such disability.
[3] A disability is nonetheless real because its causation is imaginary. The test is whether the employee is sincere in his belief that he suffers a disability resultant of a real injury. Miller v. United States Fidelity and Guaranty Co., supra.

The case of Babineaux v. Consolidated Alum. Corp., 389 So.2d 818 (La.App. 3d Cir. 1980), relied on by appellees is inapposite. In that case there was testimony by one doctor that the plaintiff was a malingerer and another had released him for work. Here no doctor had released Hughes for work and there is no testimony that he is a malingerer, while there is contrary testimony.
[4] R.S. 22:658All insurers issuing any type of contract other than those specified in R.S. 22:656 and 22:657 shall pay the amount of any claim due any insured including any employee under Chapter 10 of Title 23 of the Revised Statutes of 1950 within sixty days after receipt of satisfactory proofs of loss from the insured, employee or any party in interest. Failure to make such payment within sixty days after receipt of such proofs and demand therefor, when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of 12% damages on the total amount of the loss, payable to the insured, or to any of said employees, together with all reasonable attorney's fees for the prosecution and collection of such loss, or in the event a partial payment or tender has been made, 12% of the difference between the amount paid or tendered and the amount found to be due and all reasonable attorney's fees for the prosecution and collection of such amount. Provided, that all losses on policies covering automobiles, trucks, motor propelled vehicles and other property against fire and theft, the amount of the penalty in each of the above cases shall be 25% and all reasonable attorney's fees.
[5] Decisions construing R.S. 23:1201.2 are persuasive in construing R.S. 22:658. Roberie v. Ashy Construction Company, 215 So.2d 857 (La.App. 3d Cir. 1968), writ refused 217 So.2d 414 (La.1969).
[6] See also McDonald v. International Paper Co., 406 So.2d 582 (La.1981), where an award of penalties and attorney's fees was reversed by the supreme court in a case where all medical evidence produced at trial established worker's death was due to work-related stress. The court there said:

"Whether the work-related mental and emotional stress was extraordinary or any greater than that of everyday life, and whether this stress was a real cause of the employee's heart attack were serious questions that could only be resolved by trial. The employer's failure to pay benefits within sixty days under those circumstances, was not arbitrary, capricious, or without probable cause." (Id. at 584.)