605 So.2d 616 (1992)
Steven DeFATTA, Plaintiff/Appellant,
v.
GENERAL MOTORS CORPORATION, Defendant/Appellee.
No. 23,748-CA.
Court of Appeal of Louisiana, Second Circuit.
August 19, 1992.
*617 Whitmeyer, Fischer & McMahon by Timothy R. Fischer, Shreveport, for plaintiff/appellant.
Lunn, Irion, Johnson, Salley & Carlisle by Frank M. Walker, Jr., Shreveport, for defendant/appellee.
Before NORRIS, LINDSAY and BROWN, JJ.
NORRIS, Judge.
Steven DeFatta appeals a judgment that rejected his claim for workers compensation benefits. He urges, in essence, that the trial court was clearly wrong in finding that he failed to prove a compensable claim after February 24, 1988, by a preponderance of evidence. For the reasons expressed, we affirm.

Background facts
DeFatta went to work at age 25 on the assembly line of Shreveport's General Motors plant. In July 1986 he reported to the plant medical director with severe pain in his right hand. At trial he testified this resulted from an injury on the job; however, his treating physician, orthopedist Carl Goodman, testified that the job merely aggravated a pre-existing condition. Dr. Goodman found "hard swelling" on the back of DeFatta's right wrist and diagnosed tendinitis.
On July 18, 1986 Dr. Goodman operated to remove an exostosis (bony prominence) that was interfering with the motion of the tendons on the back of DeFatta's hand. The operation went well; within a month DeFatta was back at the plant on light duty, such as sweeping. Ultimately he returned to heavy work on the line installing dashboards. During this time he complained of pain in his right hand. Dr. Goodman's medical notes from October 1986 record "some persistent swelling and pain" and, in March 1987, "some enlargement at the base of the metacarpals." Dr. *618 Goodman testified, however, that during this time he never saw actual swelling or redness or felt heat in the area.
In May 1987 DeFatta went to another orthopedist, W.S. Bundrick, who diagnosed traumatic exostosis and tendinitis of the right wrist. About a week later DeFatta returned to Dr. Goodman, who confirmed it was a bony enlargement of the second and third metacarpal bones, probably a result of the first operation.
On May 28 Dr. Goodman performed a second operation, again to remove the exostosis. This time recovery was somewhat slower; in late July DeFatta went to a different orthopedist, Clinton G. McAlister. Dr. McAlister found tenderness with no real swelling, sensation intact and motor strength good. He felt that DeFatta could not do his regular work but could handle limited work with no heavy lifting or fine, repetitive motion of the upper extremity. By August 7 Dr. Goodman recommended that DeFatta be placed in a job where he "primarily uses his left hand and the right hand is just used for support." His work release, dated August 21, specified "no heavy lifting, gripping or straining" in the right hand for three months. Throughout this time DeFatta continued to complain of pain in the hand.
Mrs. Carroll, in GM's personnel department, testified that there were no jobs available at the plant to meet Dr. Goodman's limitations. She therefore kept De-Fatta on temporary total benefits, which he had been drawing since June 1987.
Later, Dr. Goodman extended the limitations until January 1988. He also consulted with Dr. McAlister; both agreed that DeFatta's work activity should be limited and that a surgical fusion of the wrist, which would fix the joint in a fairly rigid position, might afford some relief but should be considered a last resort. On February 15, 1988 DeFatta returned to Dr. Goodman, still complaining of pain. Though Dr. Goodman found full function and range of motion, minimal tenderness, and no redness or heat, he recommended continuing the limitations indefinitely.
At this time Mrs. Carroll felt that there was an available job, heater core install, that was within DeFatta's limitations though it required the use of a lightweight power tool. Mr. Eugene Gobert, a production supervisor, testified that the job was actually center duct install; DeFatta himself called it "inside heater install." Regardless of the exact name of the job, Mrs. Carroll felt DeFatta could do it and she discontinued his benefits on February 24, 1988.
DeFatta went to the company doctor, V.M. Osetinsky, that day and was given a work release for "no lifting over 20 lbs. with the right hand, no power tools over 30 newtmeters, no manipulative fine movements." DeFatta reported to the plant that night for his evening shift. As Mr. Gobert was walking him to the workstation to show him the new job, DeFatta suddenly said he had more restrictions than those listed in Dr. Goodman's note. He left the plant without attempting the job.
DeFatta returned to Dr. Goodman on February 29 and was given a work release with stricter limitations not to use any power tools or lift more than 10 lbs. on a repetitive basis. On March 1 he returned to Dr. Osetinsky who wrote a note saying, "No power tools of any kind, no lifting over 10 lbs. on a repetitive basis, permanent restriction."
DeFatta reported for work that evening and Mr. Gobert placed him on a new job, RC rod install, which requires no power tools but uses pliers to take caps off the rods. Mrs. Carroll testified that this job was within all the limitations. DeFatta felt the job would be beyond his limitations, but he attempted it. He testified that it was an easy job, yet his wrist started swelling within one hour, so he reported to medical and iced it down for a few minutes. De-Fatta's fellow employees, Daison and Kerr, as well as his union committeeman, Keyes, verified that his hand was swollen and he was in apparent pain. Mr. Gobert, who watched only the beginning of DeFatta's shift, thought he was doing all right. After the ice treatment, DeFatta returned to the line and worked until the swelling recurred; *619 he went back for more ice treatment, then returned to the line. The third time he came back for ice, the duty nurse told him just to go home.
The following day DeFatta returned to Dr. Osetinsky, who upgraded the restrictions to "no fine or repetitive movements, no lifting over 5 lbs. with right hand, no use of pliers, no punching or squeezing with right hand, till 30 June 1988." DeFatta did not attempt to resume work at GM after March 1. Dr. Goodman also signed an attending physician's report saying that DeFatta was totally disabled until June 30, 1988.
Mrs. Carroll phoned Dr. Goodman on March 9 and described two jobs, heater core install and RC rod install, which she still felt DeFatta could perform. Dr. Goodman agreed that these jobs should be within the limitations. Two days later, in an office visit, DeFatta told Dr. Goodman he had tried the RC rod install job but was unable to do it. In a physical exam, however, Dr. Goodman still found "No redness, heat or swelling. Full function." He agreed with Dr. Osetinsky's limitations.
At GM's request, DeFatta was examined by yet another orthopedist, W.W. Fox, on March 15. Dr. Fox found a diminished range of flexion in the right wrist and "a little tenderness" at the bases of the second and third metacarpals. He compared DeFatta's limitations with a description of the heater core job and concluded that De-Fatta could indeed perform that job. Dr. Fox did not recommend any physical treatment, but advised that if DeFatta felt he could not perform the job, he should get psychological testing to address his "subjective complaints and hostility" which were "out of proportion to his lack of objective findings."
DeFatta was permitted to draw sick leave from March 2 until July 7, 1988. In May Dr. Goodman's associate, Dr. Gordon Mead, wrote that DeFatta would be "permanently restricted from any assembly line work." DeFatta filed this suit on July 1 seeking temporary total benefits until June 30 and supplemental earnings benefits thereafter.
In July 1988 DeFatta opened a small business with his brother, called DeFatta's Gift Shop, which bought and shipped butter cookies to customers of J. Williams Lincoln Mercury. The enterprise did not entail much physical work for DeFatta, as the cookies were delivered to his house and then shipped by UPS to the customers. GM made a surveillance video of DeFatta loading cookie boxes into his car and then unloading them at another house. (The tape also shows DeFatta using his right hand to place Coke cases in his trunk at a store.) DeFatta curtailed the venture in October 1989, not because of problems with his hand but because it was not generating much income. DeFatta has not worked since, and cited the litigation with GM as an additional reason. He testified he was willing to return to work at GM if he would be given a left-hand dominant job; however, Mrs. Carroll testified that no jobs at the plant favored one hand over the other.
At trial DeFatta described the pain as setting in with the "slightest bit of use"; gripping a steering wheel for 20 minutes causes "unbearable cramping." He also testified that since March 1988 he has not used his hand in such a way as to "move it up and down or extend it, flex it at the wrist." He admitted, however, going on a fishing trip to Destin, Florida the week before trial; his friend, Pete Kerr, testified that DeFatta split the driving with him. R.p. 242. The surveillance videotape also shows DeFatta bending and flexing the right wrist more than his testimony admitted.

Action of the trial court
In a written opinion, the trial court summarized the medical history. It found in essence that although he saw few objective indications of disability, Dr. Goodman always set limitations according to DeFatta's latest complaints of pain. Every time, DeFatta would return and ask for greater limitations and Dr. Goodman complied. However, when Dr. Goodman viewed a videotape of the jobs, he stated that DeFatta should have been able to perform some of *620 them; the court drew the same conclusion from its own review of the tape.
The court found that DeFatta's testimony was "exaggerated with respect to the extent of pain that he suffered and his inability to perform various tasks." The court also considered the surveillance video as impeaching his claims that he could not lift and maneuver with the hand. In light of the objective evidence, the court found DeFatta should have been able to perform some of the jobs that were described and available; the evidence did not preponderate to show the injury made him unable to do the work offered. The court therefore dismissed DeFatta's claims.

Discussion
At the time of DeFatta's injury, temporary total disability was defined as
[I]njury producing temporary total disability for an employee to engage in any self-employment or gainful occupation for wages whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee at the time of injury was particularly fitted by reason of education, training, or experience. La.R.S. 23:1221(1), as amended by La. Acts 1983, 1st Ex.Sess., No. 1.
The other relief sought by DeFatta, supplemental earnings benefits, was defined as
[I]njury resulting in the employee's inability to earn wages equal to ninety percent or more of wages at the time of injury, * * * in any employment or selfemployment, whether or not the same or similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee at the time of injury was particularly fitted by reason of education, training, and experience[.] La.R.S. 23:1221(3)(a), as amended by La. Acts 1985, No. 926.
The plaintiff in a workers compensation case bears the burden of proving his case by a preponderance of the evidence. Prim v. City of Shreveport, 297 So.2d 421 (La.1974); Hughes v. Webster Parish Police Jury, 414 So.2d 1353 (La. App.2d Cir.1982). Whether a plaintiff has met his burden depends on the totality of the evidence, including lay and medical testimony. Harrison v. Chicago Mill & Lumber Co., 446 So.2d 843 (La.App. 2d Cir. 1984).
The trial court's findings are subject to the manifest error rule. Culp v. Belden Corp., 432 So.2d 847 (La.1983). Under that rule a court of appeal may not set aside the trial court's finding unless there is manifest error or the finding is clearly wrong; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are just as reasonable. Rosell v. ESCO, 549 So.2d 840 (La.1989). Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Manifest error may be found when documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Wilson v. Jacobs, 438 So.2d 1119 (La.App. 2d Cir.1983), writ denied 443 So.2d 586 (1983). However, in the absence of such factors, the factfinder's decision to credit one witness's testimony over that of others is virtually never manifest error. Rosell v. ESCO, supra.
The evidence easily shows that DeFatta sustained a work-related injury, or a work-related aggravation of a pre-existing condition; that he required two surgeries to correct an apparent problem, the exostosis; and that a prolonged period of recuperation was required. The issue is whether by February 24, 1988 the lingering effects of the surgeries rendered DeFatta unable to engage in any self-employment or gainful occupation for wages until June 30, 1988, and afterwards to earn wages equal to 90% of his pre-injury wage, regardless of working in pain. R.S. 23:1221(1), (3)(a) and (b). No doubt there was residual pain.
The magnitude of the pain, as addressed by Dr. Goodman, merits special attention. *621 True, Dr. Goodman always complied with DeFatta's requests for additional limitations; in the letter of October 13, 1988, he stated that DeFatta has a "chronic right wrist problem which will preclude him from returning to any type of work that requires repeated use of the hand and wrist." Even while expressing these opinions, however, he never observed physical symptoms consistent with debilitating pain, such as redness or swelling. Whenever he was given a description of certain jobs on the line, he felt that DeFatta could perform them. Notably, at trial on June 20, 1990, Dr. Goodman watched the videotape of five jobs at the GM plant and testified that DeFatta would be capable of performing those jobs. R.p. 323. In short, Dr. Goodman's testimony was ambivalent, sometimes saying that DeFatta was disabled, but often admitting that he could perform jobs that did not involve heavy lifting or power tools. In effect, Dr. Goodman's testimony was that he set restrictions in accordance with DeFatta's subjective complaints. This evidence does not clearly support DeFatta's claims of disabling pain, and is not a basis for declaring the trial court's decision clearly wrong.
As for DeFatta's own testimony, the trial court found his complaints of pain to be "exaggerated." We must admit that this is not readily apparent from the printed transcript, and yet there is some evidence to support the finding. On the evening of February 24, 1988, DeFatta was being led to a new job on the line. Before he knew what the job was or what it entailed, he told Mr. Gobert he had more medical limitations than those listed on the work release. It is strange that a man with a professed ambition to return to work would decline a job without even trying it first. On two occasions at trial DeFatta testified that gripping a steering wheel for even a few minutes brought excruciating pain. However, his friend, coworker and former roommate Pete Kerr testified that when the two of them went to Florida a week before trial, DeFatta split the driving with him. There is also the surveillance video, showing DeFatta unloading cookie boxes and loading Coke cases in his car. While this tape is not remarkable, it certainly shows a man who can function normally and without apparent distress. Finally there is Dr. Fox's observation that DeFatta's complaints and hostility were out of proportion to objective symptoms. This is consistent with the trial court's decision to discredit DeFatta's testimony.
In saying this we do not mean to ignore the fairly substantial evidence that goes the other way. DeFatta and several of his witnesses, Kerr, Daison and Keyes, all said he had swelling after minimal use of the hand. It was most severe, they said, on the evening of March 1, after DeFatta attempted to perform RC rod install. However, these symptoms were not noted by any of the physicians; the duty nurse who presumably saw it was not called to testify. We would also note, with the trial court, that Kerr was DeFatta's friend and former roommate, while Daison and Keyes were his union associates. Residual pain in the hand and wrist is perhaps a reasonable explanation why a person like DeFatta, who formerly was active and energetic, would not resume work after February 1988. However, on the instant record, the evidence that DeFatta's claims are exaggerated is sufficient that the trial court's finding to that effect cannot be declared plainly wrong. The finding, moreover, is heavily based on a credibility judgment which is entitled to great deference. Under the circumstances this record does not permit us to undermine the judgment as manifestly erroneous.
In conclusion, the trial court was not plainly wrong in finding that DeFatta's complaints of pain were exaggerated and not corroborated by the objective symptoms. On this record DeFatta did not prove by a preponderance that he was entitled to temporary total or supplemental earnings benefits. DeFatta's second assignment, contesting the denial of penalties and attorney fees, is not considered. The judgment is affirmed at plaintiff's cost.
AFFIRMED.