582 So.2d 902 (1991)
Jerry LYNN, Plaintiff-Appellant,
v.
BERG MECHANICAL, INC. and Travelers Insurance Company, Defendants-Appellees.
No. 22,552-CA.
Court of Appeal of Louisiana, Second Circuit.
June 19, 1991.
*905 Patricia N. Miramon, Shreveport, for plaintiff-appellant.
Kullman, Inman, Bee, Downing & Banta by S. Mark Klyza and Donna K. Wilson, New Orleans, for Berg Mechanical, Inc.
Blanchard, Walker, O'Quin & Roberts by Ansel Martin Stroud, III, Shreveport, for Travelers Ins. Co.
Before MARVIN, C.J., and NORRIS and LINDSAY, JJ.
MARVIN, Chief Judge.
In this worker's compensation action, the claimant appeals the final judgment rejecting his demands for benefits and attorney fees and an earlier judgment dismissing his *906 claims for retaliatory discharge, as prescribed, and for intentional interference with contractual rights, on the sustaining of the peremptory exception of no cause of action.
The trial court awarded claimant almost $4,500 for some past medical expenses incurred. The employer and its w.c. insurer, answering the appeal, complain that about $1,100 of the past medical expenses should not have been awarded.
We amend to award other past medical expenses incurred and to award statutory penalties and attorney fees. As amended, the judgment is affirmed.

FACTS
Jerry Lynn, who had worked for about three years as a plumber for Berg Mechanical, Inc., was seriously injured while assisting in the repair of a truck at one of his employer's jobsites. A metal spring, forcibly propelled from the airbrake system of the truck, struck Lynn's head, knocking him to the ground. We chronologically summarize the circumstances:
August 31, 1981The accident occurs, causing skull fractures, nasal and sinus fractures, forehead laceration, chipped teeth, fractured bridge, and a brain concussion. Lynn was seen by a neurologist, Dr. Martinez, an ENT specialist, Dr. McDonald, and shortly thereafter by a dentist, Dr. Robertson.
September 5, 1981Lynn was discharged from initial hospitalization and thereafter had follow-up care. He reported headaches and jaw and neck pain to Dr. McDonald on September 10 and to Dr. Martinez on September 18. He was released from Dr. McDonald's care of nose and sinus injuries on October 27.
October 12, 1981Dr. Martinez reported continued neck pain and headaches, along with lower back pain aggravated by bending or lifting. Range of motion of the neck and lumbosacral spine appeared normal to Dr. Martinez.
November 4, 18, 1981Lynn continued to complain of headaches and neck pain on visits to Dr. Martinez. Motor and sensory examination was normal. Dr. Martinez released him to return to light-duty work on November 30, increasing to full activity in two-three weeks.
December 1, 1981Compensation benefits were terminated. Lynn returned to work on November 30, 1981, gradually resuming full duties on a later unknown date.
December 6, 1981Lynn gained approval of compensation insurer and began seeing Dr. Mooring, chiropractor, for complaints of headaches and neck and low back pain. Dr. Mooring initially diagnosed Lynn as suffering from severe cervical and lumbar sprain complicated by severe spinal distortions, vertebral displacements, spinal fixations, and severe trauma to the forehead.
December 22, 1981Dr. Mooring reported that Lynn was responding well to treatment with prognosis of full recovery, with considerable time and work being necessary for total recovery. Dr. Mooring continued chiropractic treatment, noting "improved" response on March 1. The w.c. insurer paid for Dr. Mooring's treatments.
February 17, 1982Lynn was seen by Dr. Gleason, orthopedist, at insurer's request. Lynn had fairly good range of motion in his neck and lower back, but complained of pain in those areas. Diagnosis was chronic neck and back strain. Dr. Gleason recommended a rehabilitation program to strengthen muscles and relieve neck and back strain. Continued chiropractic treatment by Dr. Mooring was approved by Dr. Gleason to relieve Lynn's symptoms. Dr. Gleason did not foresee permanent disability. Dr. Gleason noted Lynn related a previous neck injury in an auto accident several years earlier that had healed before the 1981 accident.
April 7, 1982Acute exacerbation and recurring muscle spasm symptoms, cervical myositis-neuritis, reported by Dr. Mooring. On April 28, 1982, Dr. Mooring opined that Lynn was about 80 percent asymptomatic and was functioning in full-duty capacity at work. Dr. Mooring estimated that Lynn would reach total recovery after minimal therapeutic care for six months.
*907 July 27, 1982; September 13, 1982Dr. Mooring reported he found it impossible to project the period of time Lynn would continue to need treatment, which had produced only a partially favorable response. Dr. Mooring stated that continued chiropractic treatment would reduce exacerbation and allow Lynn to continue working.
Berg Mechanical's w.c. insurance policy with Travelers expired sometime after the October 31, 1981, accident. Berg then obtained w.c. insurance with Commercial Union Insurance. Travelers, and not Commercial Union, was made a co-defendant with the employer.

MEDICAL BENEFITS ENDED
June 7, 1983Travelers informs Lynn by letter that his then physical problems and need for treatment possibly did not result from the original injury but arose from aggravation of the original injury by his work. Travelers suggested that if this was the case, it would not owe Lynn any further benefits. At the same time Travelers wrote Dr. Mooring, suggesting that he submit his bills to Berg's present w.c. insurer.
We note that Travelers' representative, Boston, testified that Travelers decided to terminate Lynn's medical benefits on or about June 7, 1983. Travelers did not pay, however, for Dr. Mooring's treatments of Lynn after May 4, 1983. Boston also testified that Travelers relied on Dr. Gleason's report of no disability and made no investigation to determine if Lynn was complaining to Dr. Mooring of a specific or particular on-the-job second injury which exacerbated the original injury or whether the exacerbation was caused by normal on-the-job exertion. Dr. Gleason's report of no disability was written, however, on August 11, 1983.
July 25, 1983Lynn again sees Dr. Gleason at Travelers' request. Dr. Gleason reports that Lynn still complained of headaches and neck and back pain and was continuing to receive chiropractic treatment. Dr. Gleason recommended tests be performed to rule out spinal arthritis.
August 11, 1983Dr. Gleason reported arthritis test results were negative in face of Lynn's continued complaints for which he could find no cause. He recommended that Lynn do light weightlifting to rehabilitate muscles supporting the spine. Dr. Gleason found no disability resulting from the 1981 accident and directed Lynn to continue full-duty work.
In this respect we note Travelers could not have relied on Dr. Gleason's August 11, 1983, report of no disability to terminate medical benefits. Although Travelers ceased paying Dr. Mooring, it paid the later charges of Dr. William Bailey, a general surgeon and practitioner, who began seeing and treating Lynn on December 3, 1982, on an apparent continuing basis through July 27, 1989. Lynn was seen on December 16, 1982, by Dr. Karl Heiserman, dentist, for an abscessed tooth which was treated at that time. Lynn was again seen by Dr. Heiserman on June 25, 1983 for a prophylaxis. Dr. Heiserman did not testify at trial nor by deposition as to the necessity of the dental treatment performed. Boston testified that Travelers did not receive medical reports or bills regarding Lynn's treatment by Dr. Heiserman.
April 6, 1984Lynn sued to enforce payment of medical benefits and penalties. Lynn's action, filed in Shreveport City Court, was based on Travelers' failure to pay charges that arose from Dr. Mooring's continued chiropractic treatment.
May 9, 1984Lynn began receiving chiropractic treatment from Dr. J.A. Wiseman on referral by Dr. Mooring. Agreeing with Dr. Mooring's diagnosis and prognosis, Dr. Wiseman opined that Lynn would need chiropractic treatment for the remainder of his life. He reiterated this opinion on August 14, 1985, when he ceased treating Lynn.
In this respect Boston testified Travelers did not receive medical bills or reports concerning Lynn's medical treatment by Dr. Wiseman.
December 1984Lynn was temporarily laid off. He resumed working two or three months later.
*908 September 17, 1985Lynn began receiving bi-monthly psychiatric treatment from Dr. Joe Hayes for post-traumatic depression, including suicidal tendencies, and chronic pain syndrome of the neck, head and back. Dr. Hayes opined the depression resulted from chronic pain and Lynn's feeling that he was not being treated fairly by Berg and Travelers. Lynn continued to see Dr. Hayes until March 1987.
September 23, 1985Lynn's employment was terminated by Berg Mechanical, but he was reinstated before February 14, 1986.
October 28, 1985Lynn began seeing, on referral by Dr. Hayes, Dr. Larry Broadwell, rheumatologist, whose diagnosis was permanent chronic cervical strain resulting from the 1981 injury. Dr. Broadwell stated Lynn could possibly get some relief from medication, exercise, and treatment of his chronic depression.
We again note that Boston testified Travelers did not receive medical reports or bills regarding Lynn's treatment by Drs. Hayes or Broadwell.
November 15, 1985Lynn filed his action for disability benefits in Caddo District Court. The April 6, 1984, suit for medical benefits that was filed in city court was effectively incorporated into the November 15, 1985, action for disability benefits.
We note here that John Morneau, Lynn's initial attorney, testified that medical bills and reports were photocopied and sent to Travelers' attorney as soon as they were received. Boston testified that after Lynn filed suit he did not receive any medical bills for Lynn's treatment.
May 5, 1986Dr. Simeon Wall performed reconstructive rhinoplasty and a midturbinate resection to correct what he found was a chronic nasal obstruction, nasal septal deviation, and turbinate hypertrophy. Dr. Wall related these findings to Lynn's 1981 injury.
May 14, 1986On referral by Dr. Heiserman, Dr. Perry Hollembeak, dentist, diagnosed Lynn as having temporomandibular joint syndrome, "probably caused" by the 1981 injury. Dr. Hollembeak thereafter successfully treated the TMJ syndrome with appliance therapy, although Lynn still complained of some pain. Periodontal abscesses found by Dr. Hollembeak were thought "probably not related" to the 1981 injury. Endodontic therapy was performed by Dr. Paul Wood, dentist, in 1986 to save two abscessed teeth. The record does not contain any testimony by Dr. Wood.
September 4, 1986Lynn was examined by Dr. James Albright, orthopedist, who found tenderness in the mid and lower cervical spine and instability in the lower spine, with palpable slipping or clicking.
May 22, 1987On x-ray and other examinations, Dr. Albright found Lynn's neck to have improved, with Lynn still experiencing palpable clicking and pain localized in the sacral area with more stability in his lower back. Because of the duration of Lynn's symptoms, Dr. Albright thought Lynn's condition would probably stay the same or become worse. Lynn's "debilitating" lower back was thought to be caused by his continuing to do plumbing work.
November 25, 1987Lynn amended and supplemented his district court petition by adding several of Berg's corporate officers as defendants and by alleging retaliatory discharge and intentional interference with contractual rights.

RESOLUTION BELOW
The trial court granted defendants' motion for partial summary judgment dismissing the retaliatory discharge claim as prescribed and dismissed the intentional interference with contractual rights claim upon sustaining defendants' exception of no cause of action. Lynn's demand for disability benefits was deferred to trial on the merits.
After trial, the court rejected Lynn's demands for disability benefits, as prescribed. The court awarded some of the past medical expenses incurred by Lynn, while denying other past medical expenses and future medical expenses. Penalties were denied on the finding that Travelers' action in discontinuing payment of the chiropractic bills in 1983 was not arbitrary or capricious.

*909 RETALIATORY DISCHARGE
The discharge of an employee because of the assertion of a w.c. claim is prohibited by LRS 23:1361. Such conduct by an employer is considered tortious. The action for retaliatory discharge is subject to the one year prescription. Arvie v. Century Telephone Enterprises, Inc., 452 So.2d 392 (La.App. 3d Cir.1984); CC art. 3536.
Lynn's original petition in the district court, filed November 15, 1985, alleged the fact of his discharge. He alleged that discharge was retaliatory in his first amending and supplemental petition that was filed November 25, 1987. Citing Ray v. Alexandria Mall, 434 So.2d 1083 (La.1983), Lynn argues that the 1987 first amending and supplemental petition relates back to the 1985 filing of his original petition and makes his claim for retaliatory discharge timely.
Ray established specific criteria for determining whether and when CCP Art. 1153 permits an amendment that changes the identity of a party to relate back to the date of filing of the original petition. 434 So.2d at 1086. We are not here concerned with whether the employer or the insurer were correctly identified in Lynn's petitions. Our concern is the distinct nature of the cause of action for retaliatory discharge under LRS 23:1361, which was created and added to the w.c. statutes by Act 704 of 1980.
Retaliatory discharge is labeled by the Legislature as a "discrimination" by the employer, for which the employee "shall be entitled to recover from the employer ... a civil penalty [of] ... not more than one year's earnings ..." § 1361. Discriminatory conduct prohibited by statute is an "offense or quasi-offense" arising from "the violation of some duty imposed by law" that is subject to the prescriptive period of one year. See Arvie v. Century Tel. Enterprises, Inc., cited supra, and state and federal cases cited and discussed therein.
Unlike other sections of the w.c. law relating to death, medical, and disability benefits, which are liberally construed, § 1361 imposes a civil penalty and is strictly construed. Guye v. International Paper Co., Inc., 488 So.2d 1108 (La.App. 2d Cir.1986).
The exercise of the right to the § 1361 penalty, in our appreciation, is a legislatively provided means or right to protect and enforce the right to worker's compensation benefits provided in other sections of the statute. Each right is distinctly and conceptually different from the other. The purpose for which the § 1361 right exists "is to allow employees to exercise their rights to worker's compensation benefits without fear of retaliatory action by their employer." Ducote v. J.A. Jones Const. Co., 471 So.2d 704 (La.1985).
Even if we assume that Lynn's September 1985 discharge was retaliatory under § 1361, Lynn did not allege his distinct right until two years after the discharge when he filed his first amending and supplemental petition on November 25, 1987. The amendment alleging this distinct cause of action cannot relate back to the filing of his original petitions of April 6, 1984, to enforce payment of medical benefits, and of November 15, 1985, to enforce payment of disability benefits.
We therefore approve the trial court's judgment that the demand for the statutory penalty arising out of Lynn's alleged retaliatory discharge prescribed one year from the date of the alleged discharge.
Parenthetically we note that the record shows that Lynn was rehired by the employer sometime after September 23, 1985, by order of the National Labor Relations Board which found the September 23, 1985, discharge was an unfair labor practice that was founded on Lynn's non-union status. Lynn apparently complained to NLRB. The record also shows that Lynn was thereafter again discharged on February 14, 1986. Lynn here complains only of the 1985 discharge.

DISABILITY BENEFITS
The City Court suit, filed April 6, 1984, to enforce payment of medical benefits did not operate to interrupt prescription for w.c. disability benefits. Comeaux *910 v. Delcambre Seafood Market, 346 So.2d 1277 (La.App. 3d Cir.1977), writ denied.
The prescriptive periods applicable to Lynn's claim for disability benefits are found in LRS 23:1209. This section provides that claims are barred unless filed (1) within one year from the date of the accident; (2) one year from the last compensation payment for total disability or three years from the last payment for partial disability; or (3) one year from the time the injury develops if not immediately manifest, but no more than two years after the accident. We shall refer to this latter two-year period as the period for bringing an action for "developing disability."
After the accident occurred August 31, 1981, Lynn was paid compensation through November 30, 1981. His action for w.c. disability benefits in the trial court was filed on November 15, 1985. Because that suit was prescribed on its face, Lynn had the burden of showing that prescription was interrupted in some manner. Wesley v. Claiborne Elec. Co-op, Inc., 446 So.2d 857 (La.App. 2d Cir.1984), writ denied.
Lynn argues that prescription was interrupted because he was lulled into a false sense of security by Travelers and was thus prevented from timely filing suit. Alternatively, Lynn argues that because his disability did not develop until Dr. Albright found him totally disabled in May 1987, his November 15, 1985, action is timely.
To prove that he was lulled into a false sense of security, a w.c. claimant must show that words, actions or inactions on the part of the employer or insurer induced him to withhold suit until the w.c. claim had prescribed. Wesley v. Claiborne Elec. Co-op, supra.
Lynn relies on two letters in this respect, one to him from Travelers dated August 20, 1982, and the other to his attorney from Travelers dated September 19, 1983. He ignores other letters and circumstances which we shall mention.
In Travelers' letter of August 20, 1982, Boston wrote Lynn it would soon be one year from the date of his accident and assured Lynn that there would be no problem regarding payment of medical bills related to his injury since the w.c. act provided for lifetime benefits.
In Travelers' letter to Lynn's attorney of September 19, 1983, Boston wrote that Lynn's attorney should contact him to "work out something for Jerry [Lynn]."
Even if we assume at this juncture that Lynn was "lulled" by the 1982 letter about "lifetime medical benefits" under the w.c. law, Travelers distinctly and expressly questioned Lynn's entitlement to further medical benefits on or about June 7, 1983, when Travelers terminated Lynn's medical benefits. The termination of Lynn's medical benefits effectively ended Lynn's arguable "lull" that we assume was present in 1982 and refutes his claim that he remained lulled in a false sense of security that caused him not to file his action for disability benefits until November 15, 1985.
Lynn argues in the alternative that his November 15, 1985, demand for disability benefits was timely filed because he was not determined to be totally disabled until Dr. Albright's diagnosis in May 1987. The thrust of Lynn's argument in this respect is that his developing disability, which became manifest in 1987, then commenced a new prescription period of one year. See Burleigh v. Argonaut Ins. Co., 347 So.2d 13 (La.App. 3d Cir.1977), writ denied.
Even if we were to agree that Lynn's injuries had caused a developing disability that later manifested itself, as recognized in Swearingen v. Air Products & Chemical, Inc., 481 So.2d 122 (La.1986), the statute requires that a claim for developing disability be instituted within two years from the date of the accident that causes the developing disability. LRS 23:1209. Lynn's demand for benefits for disability arising from the October 31, 1981, accident was not instituted until November 15, 1985, and is prescribed. LRS 23:1209. Cf. Crown Zellerbach Corp. v. Louisiana Worker's Compensation Second Injury Board, 517 So.2d 288 (La.App. 1st Cir. 1987).
*911 We cannot find on this record that the two-year period within which suit for benefits must be brought for developing disability was interrupted in any manner. Any assumed "lull of false security" on Lynn's part ended on or about June 7, 1983, when Travelers terminated Lynn's medical benefits, more than two years before he instituted his action on November 15, 1985, for disability benefits.

INTENTIONAL INTERFERENCE WITH CONTRACTUAL RIGHTS
Lynn asserts that the allegations of intentional interference in his first supplemental and amended petition set forth a cause of action under 9 to 5 Fashions, Inc. v. Spurney, 538 So.2d 228 (La.1989). We disagree.
Spurney did not adopt the broad common law doctrine of tortious interference with contracts, but recognized a limited and narrowly defined cause of action for the breach of duty by a corporate officer to refrain from intentionally and unjustifiably interfering with a contractual relationship between the officer's corporate employer and the particular plaintiff.
Spurney recognized that the action against a corporate officer for intentional and unjustified interference with contractual relations had separate elements: (1) the existence of a contract or a legally protected interest between the plaintiff and the corporation; (2) the corporate officer's knowledge of the contract; (3) the officer's intentional inducing or causing the corporation to breach the contract or his intentional rendering of performance under the contract impossible or more burdensome; (4) absence of justification on the part of the officer; and (5) causing damage to the plaintiff by the breach of contract or by rendering the performance of the contract impossible or difficult.
In his 1987 amending and supplemental petition Lynn alleged two broad areas of "interference" by Berg's corporate officers. He asserted that the corporate officer-defendants interfered with his "lawful contractual rights to seek and secure employment [with others]. [sic]" He also asserted the corporate officers interfered with his employment relationship with the corporate employer, Berg Mechanical.
The first Spurney element speaks of the existence of a contract or a legally protected interest between plaintiff and the corporation. The fifth Spurney element requires that the plaintiff in the contractual relationship with the corporation allege and show that the tortious conduct of the corporate officers [inducing the corporation to breach the contract or render performance impossible or burdensome] caused damage to plaintiff.
Lynn asserts that the corporate officer-defendants made his performance of his duties more onerous by assigning him to more strenuous jobs, intending to cause him to resign his employment. He further alleges, however, that when he refused or failed to resign, "he was fired or terminated... due to his asserting a claim against his employer for worker's compensation benefits." Lynn's conclusionary allegations of damage from this alleged "interference," we find, are enervated and negated by his factual allegations.
Once Lynn was fired or terminated as he alleges, Lynn had only an action for any imagined breach of his employment contract or for wrongful discharge against Berg Mechanical. His "termination" and his "damage," according to his factual allegations, did not arise from the alleged intentional interference that made his performance of his employment duties more onerous and caused him to resign. He factually asserts he "refused to resign" and was fired or terminated "due to his asserting a claim ... for worker's compensation benefits," which is the § 1361 retaliatory discharge we have discussed supra.
The other area of interference alleged complains that the corporate officer defendants interfered with Lynn's "lawful contractual rights to seek and secure employment [with others]. [sic]" Spurney did not create a cause of action against a corporate officer for intentionally interfering with a contractual relationship between a *912 former employee of his corporation and a third party employer, prospective or actual.
The Spurney cause of action is limited to interference by a corporate officer into a contractual or legally protected relationship that exists between the plaintiff [here, Lynn] and that officer's corporation [here, Berg Mechanical]. Lynn's factual allegations of tortious conduct, while negating a Spurney cause of action, assert only a cause of action for § 1361 retaliatory discharge, which arises out of the termination of an employment contract. That action, we have agreed, has prescribed.
In these circumstances we find no error in the trial court's sustaining the exception of no cause of action and dismissing Lynn's demands for interference with his Spurney rights. Lynn did not suggest below and does not suggest here what additional facts might be alleged by him to state a Spurney cause of action. CCP Art. 934.

MEDICAL BENEFITS
LRS 23:1203 requires the employer to furnish all necessary medical, surgical, and hospital services, and medicines, or any non-medical treatment to an employee injured in a work-related accident. The statute also requires the employer to furnish to the employee the necessary cost of repair to or replacement of any prosthetic device damaged or destroyed in the accident.
An injured employee claiming medical benefits under the w.c. law must prove by specific evidence that his claim is related to a reasonable certainty to his work-related injury by a preponderance of the evidence. Sewell v. Argonaut Southwest Ins. Co., 362 So.2d 758 (La.1978); Charles v. Aetna Cas. and Sur. Co., 525 So.2d 1272 (La.App. 3d Cir.1988), writ denied.
The trial court found some, but not all, of Lynn's past medical expenses not paid by Travelers to be necessary and causally related to Lynn's 1981 work-related injury. Lynn argues the trial court committed error in not awarding those medical expenses incurred to Drs. Heiserman, McInnis, Hayes, Prakasam, Mooring and Albright. He contends he proved those expenses were necessary and were related to his 1981 accidental injury. Travelers conversely complains of the trial court's award of medical expenses Lynn incurred to Dr. Hollembeak.
(1) Dr. Heiserman. The record reflects Lynn was treated by Dr. Heiserman, dentist, from December 16, 1982 to July 10, 1986. Although invoices reflecting the amount remaining owed Dr. Heiserman and a letter from Dr. Heiserman to Mr. Morneau, Lynn's previous attorney, briefly summarizing his treatment of Lynn were introduced into evidence, Dr. Heiserman did not testify at trial nor by deposition whether his treatment of Lynn was rendered necessary by the 1981 accident.
We find no error in the trial court's resolution denying this expense.
(2) Dr. McInnis. Lynn was treated by Dr. McInnis, dentist, in January 1989 for complaints of loosened caps around which decay was beginning to form and for the TMJ problem. Dr. McInnis extracted Lynn's teeth and put in lower and upper full dentures to establish good occlusion. According to Dr. McInnis' testimony, Lynn's crowns were badly worn and loosened and the wear was indicative of a bite problem and consistent with a TMJ problem. Dr. McInnis, at best however, testified that these problems "could" have been caused by the 1981 accident.
We cannot conclude that Lynn proved by a reasonable preponderance the necessity and relationship of the treatment provided by Dr. McInnis to the 1981 accident.
(3) Dr. Hayes. Lynn was treated by Dr. Hayes, psychiatrist, from September 15, 1985, to February 25, 1987. He diagnosed Lynn as suffering from post-traumatic depression and chronic pain syndrome after the 1981 accident. Dr. Hayes testified that it was necessary Lynn receive psychiatric treatment for his depression and chronic pain syndrome.
Dr. Hayes explained that Lynn exhibited feelings of inadequacy and insecurity when his bills from other doctors were not paid *913 and because he perceived he was not being treated "fairly" or being assisted by his employer's w.c. insurer. Lynn believed he deserved fair treatment and assistance because he considered himself, before the 1981 accident, to have been a reliable and hard-working employee. Dr. Hayes testified that Lynn stated he had become asocial and had less pride in his work and less motivation because of his depression, caused or related primarily to the sequence of events occurring after the accident.
The trial court did not assign reasons why benefits for Lynn's psychiatric treatment by Dr. Hayes were denied. Dr. Hayes's testimony preponderates and convinces us that the treatments were necessary and related to the 1981 injuries. Lynn established to a reasonable certainty that his depression was "related" to the accident because Dr. Hayes opined it was caused primarily by the post-accident sequence of events that were related to the 1981 accident. These events would probably not have occurred but for the accident. The record reflects $2,915.00 remains owed by Lynn to Dr. Hayes. We shall amend the judgment accordingly.
(4) Dr. Prakasam. Lynn was examined by Dr. Prakasam, anesthesiologist and pain management specialist, in August and October 1989. Dr. Prakasam diagnosed Lynn as suffering from TMJ syndrome and chronic pain syndrome, both of which Dr. Prakasam testified were caused by the 1981 accident.
When asked whether his bills for Lynn's treatment had been paid, Dr. Prakasam testified in deposition that he didn't "believe" they had. Although there were several printed forms from Dr. Prakasam introduced into evidence which contain handwritten dollar amounts, we cannot determine what specific amount, if any, remained owed to him by Lynn. Lynn had the burden of proving what was owed. We cannot conclude the trial court erred in not awarding benefits for medical expenses incurred to Dr. Prakasam. Sewell v. Argonaut Southwest Ins. Co., supra.
(5) Dr. Mooring. Lynn received chiropractic treatment from Dr. Mooring, chiropractor, from November 6, 1981, to May 1984. Travelers originally approved and paid for Dr. Mooring's treatments but ceased paying for them in May 1983. Evidence presented at trial indicated that a balance of $2,000.69 remained owed to Dr. Mooring for Lynn's treatment.
When the accident's relationship to the injury is unquestioned, and chiropractic treatments are determined beneficial and necessary, the employer is responsible for expenses incurred for such treatment. Gourdon v. Rockwood Ins. Co., 368 So.2d 1156 (La.App. 3d Cir.1979).
It was uncontradicted that the pain Lynn initially experienced in his back and neck was a result of the injuries from the 1981 accident. Although the chiropractic treatment was determined by Dr. Mooring to be palliative rather than curative, the treatments enabled Lynn to continue working. Dr. Gleason approved the treatments. There was no evidence presented to suggest that Lynn's continued neck and back pain arose from any other condition than the 1981 injuries or aggravation thereof by his returning to work.
We shall amend the judgment to award to Lynn $2,000.69, the amount remaining owed Dr. Mooring.
(6) Dr. Albright. Lynn was examined by Dr. Albright, orthopedist, in September 1986 and May 1987 on referral by his then attorney, Mr. Morneau. Medical expenses are not recoverable unless the physician in question renders some form of treatment. Employers and insurers are not liable under LRS 23:1203 for medical expenses incurred for purposes of litigation. Price v. Fireman's Fund Ins. Co., 502 So.2d 1078 (La.1987); Bowman v. F. Christiana and Co., Inc., 553 So.2d 971 (La.App. 4th Cir.1989). We cannot find that Dr. Albright rendered any treatment to Lynn and do not disturb the trial court's result in this respect.
(7) Dr. Hollembeak. Lynn was diagnosed by Dr. Hollembeak, dentist, on May 14, 1986, as suffering from temporomandibular joint syndrome which Dr. Hollembeak *914 testified was probably caused by the 1981 injury. Lynn's condition was successfully treated with appliance therapy while under Dr. Hollembeak's care although Lynn still complained of some pain.
We conclude the trial court correctly found Lynn's treatment by Dr. Hollembeak to be necessary and causally related to the 1981 accident.

PENALTIES AND ATTORNEY FEES
LRS 22:658 provided the applicable law at the time of Lynn's 1981 accident and when Travelers ceased paying medical benefits in May or June 1983. LRS 22:658 then provided that penalties and attorney fees shall be awarded when benefits were terminated by the employer or insurer without probable cause and in an arbitrary and capricious manner.
After LRS 23:1201.2 was amended by Acts 1983, 1st Ex.Sess., No. 1, § 1, effective July 1, 1983, LRS 22:658 was no longer applicable to w.c. cases. The 1983 amendment was substantive in nature. We therefore apply the standard found in LRS 22:658. See Cooper v. AMI, Inc., 454 So.2d 156 (La.App. 1st Cir.1984), writ denied. The statute is to be strictly construed. Lewis v. Alloy Casting of La., Inc., 465 So.2d 847 (La.App. 2d Cir.1985).
Whether termination of, or refusal to pay, w.c. benefits is arbitrary, capricious or without probable cause depends primarily on the facts known to the employer or insurer at the time of termination or refusal. Lamette v. Morrison Assur. Co., 461 So.2d 351 (La.App. 2d Cir.1984).
We agree with Lynn's contention that Travelers was arbitrary and capricious in terminating medical benefits incurred to Dr. Mooring based on the facts known to Travelers in early May and June 1983 when it ceased paying for Dr. Mooring's treatments.
The last medical benefit paid by Travelers for Lynn to Dr. Mooring was May 4, 1983. Travelers indicated in its June 7, 1983, letter to Lynn that it would no longer pay for Lynn's treatment by Dr. Mooring.
Boston, Travelers' claim representative, stated several reasons why Travelers terminated Lynn's medical benefits incurred to Dr. Mooring. Boston testified at trial that the decision to terminate payment of Lynn's chiropractic bills was based on Dr. Gleason's medical reports. Before July 1983 Dr. Gleason had only examined Lynn on one occasion, February 17, 1982. Dr. Gleason's report of that date recommended rehabilitation and continued chiropractic treatment.
Dr. Gleason examined Lynn on two occasions, July 25, 1983, and August 11, 1983, after Travelers ceased paying for Dr. Mooring's treatments. Dr. Gleason's reports on these two dates cannot be considered in determining whether or not Travelers' action in terminating benefits was arbitrary. Lamette v. Morrison Assur. Co., supra.
Boston later testified that medical benefits were terminated not because of Dr. Gleason's medical reports, but on Lynn's experiencing aggravation of his 1981 injuries while working. Boston testified Travelers received a report from Dr. Mooring dated April 7, 1982, stating that Lynn had experienced an acute exacerbation of symptomology. Boston said he spoke about that time with Lynn, who indicated to him that his condition was being aggravated while working. Boston finally said that Lynn's medical benefits were terminated because of this information.
Boston admitted, however, that Travelers did not know if Lynn's exacerbation was the result of a particular on-thejob second injury or the result of routine working exertion. He admitted Travelers made no investigation to discover the cause. Travelers had a duty to investigate to determine the cause of exacerbation before termination. Rachal v. Highlands Ins. Co., 355 So.2d 1355 (La.App. 3d Cir. 1978), writ denied.
Travelers had no facts, medical evidence, or other information which would have led it to reasonably conclude that chiropractic treatment was no longer necessary treatment for Lynn's condition. We *915 must find Travelers' termination of medical benefits in June 1983 to be arbitrary, capricious and without probable cause.
Boston testified that Travelers did not receive any medical bills or reports regarding treatment of Lynn after litigation was instituted. This circumstance does not justify Travelers' failure to consider medical expenses incurred by Lynn after May 4, 1983, because this record shows that this information was submitted to Travelers' attorneys in conjunction with Lynn's 1984 lawsuit to enforce payment of medical benefits. Submission to Travelers' attorney is submission to Travelers.
Travelers is obligated for reasonable attorney fees and 12 percent penalties on all medical benefits that have been determined were necessary and related to the accidental injuries and that were not paid. On this record, we discern that about 50 percent of the efforts of Lynn's attorneys were devoted to the medical benefits issue. Enforcement of the medical benefits issue arose sometime before the 1984 city court action was filed. That action was consolidated or incorporated into the later district court action. The eventual trial in district court was held on two days. We have summarized the testimony of the several doctors that was taken. Depositions were taken on six days. Briefs were written below and here. Oral argument was made here. The award for past medical benefits as amended, totals $9,412.36.
Considering the pleadings, briefs, and the record, we determine that a fair and just award of reasonable attorney fees is $4,000.00 for the efforts made to recover past due medical benefits. We shall amend the judgment accordingly.

DECREE
In the particulars discussed above, we amend the judgment and make the following awards to plaintiff Lynn:
Medical benefits of $2,000.69 incurred to Dr. Mooring and $2,915.00 incurred to Dr. Hayes;
Penalties of 12 percent on the total medical benefits awarded of $9,412.36; and
Reasonable attorney fees of $4,000.00 for the efforts made to recover past due medical benefits.
In all other respects, and as amended, the judgment is AFFIRMED at defendants' cost.