643 So.2d 263 (1994)
Charles TATE, Plaintiff-Appellant
v.
L & A CONTRACTING, Defendant-Appellee.
No. 26110-CA.
Court of Appeal of Louisiana, Second Circuit.
September 21, 1994.
Rehearing Denied October 20, 1994.
*265 Michael L. Poe, Shreveport, for appellant.
Lunn, Irion, Johnson, Salley & Carlisle, Shreveport by Walter S. Salley and Frank M. Walker, Jr., for appellee.
Before SEXTON, J., and JONES and PRICE, JJ. Pro Tem.
JONES, Judge Pro Tem.
Charles Tate appeals an administrative hearing officer's judgment that rejected his claim for worker's compensation benefits. He urges, in essence, that the hearing officer was clearly wrong in finding that he failed to prove a compensable claim after October 10, 1992, by a preponderance of evidence. For the reasons expressed, we amend the hearing officer's judgment and affirm as amended.

FACTS
Tate worked as a welder/bridge carpenter for L & A Contracting Co. On October 3, 1991, he injured the right side of his neck and shoulder in a job related accident. The accident happened when he jumped down from a bridge on to a scaffold. When he jumped, his right-hand work glove snagged some steel rebarb that was sticking out of the side of the bridge. That caused him to momentarily hang in mid-air until his glove tore. Apparently, the weight of his body pulled on his arm. According to Tate, that made him feel a "pop" in the right side of his neck and shoulder. Immediately after that, he said he felt pain. Due to the injury, the defendants paid Tate weekly benefits of $295.00 through October 10, 1992. They also paid most of Tate's medical expenses.
Initially, Tate was examined by Dr. Haynes. Dr. Haynes x-rayed Tate's right shoulder and found nothing objectively wrong. He diagnosed Tate as having a muscle strain and prescribed muscle relaxers. On Tate's third visit with Dr. Haynes, a cortisone injection was administered in his right shoulder. Dr. Haynes then referred Tate to Dr. Ramos, a neurosurgeon. After being delayed, Tate finally visited Dr. Ramos on January 28, 1992.
In the meantime, on December 21, 1991, Tate had a non-work related automobile accident and injured his lower back. His back injury prompted him to seek treatment from Dr. Wiseman, a chiropractor. Dr. Wiseman first examined Tate on January 23, 1992. At that time, he adjusted and resolved Tate's back injury with conservative treatment. Dr. Wiseman is the only doctor with whom Tate discussed the automobile accident and related back injury.
Dr. Wiseman's treatment pleased Tate, so, on the following day, Tate asked Dr. Wiseman to evaluate the right side of his neck and shoulder. Dr. Wiseman then began treating Tate's neck injury; however, he did *266 not treat or diagnose Tate's shoulder injury. For that injury, Dr. Wiseman referred Tate to Dr. Edwards, an orthopedic surgeon.
Dr. Wiseman's initial examination of Tate's neck revealed tenderness in Tate's cervical musculature and right shoulder. Dr. Wiseman observed that Tate had a normal range of motion in his cervical spine and right shoulder; however, movement did cause some immediate pain. Tate's neurological examination was essentially normal, and his x-ray examination only revealed some loss of the normal cervical curve. At that time, Dr. Wiseman felt that Tate had a cervical sprain.
Tate responded very well to Dr. Wiseman's treatment. On February 24, 1992, Dr. Wiseman released Tate from his care. However, that release was only in regard to Tate's neck injury. Then, after receiving continued complaints of pain from Tate, Dr. Wiseman realized he made a mistake by releasing Tate from his care.
On July 16, 1992, Dr. Wiseman ordered an EMG and a nerve conduction test. By that time, Tate had already been examined by Dr. Edwards and Dr. Ramos. Based on the test results and reports from Drs. Edwards and Ramos, Dr. Wiseman then diagnosed Tate's neck injury and concluded the problem involved a nerve root.
Dr. Edwards' treatment of Tate had begun on February 18, 1992. He limited his treatment to Tate's right shoulder injury. Dr. Edwards diagnosed Tate as having a torn rotator cuff, and, on March 11, 1992, he surgically repaired that injury. After the surgery, Dr. Edwards noted Tate would reach maximum medical improvement around September 11, 1992.
On April 8, 1992, Tate fell down and aggravated his right shoulder injury. Tate testified that the pain was so excruciating that it "knocked him out," and when he woke up, he "cried like a baby."
On May 5, 1992, Dr. Edwards informed the defendants that Tate could return to work on a part time basis of four hours a day, but, at that time, restricted him from pushing or pulling objects and from reaching above his shoulder. However, Dr. Edwards indicated that Tate could occasionally lift and carry objects up to twenty pounds. On June 15, 1992, Dr. Edwards again advised the defendants that Tate could return to work. This time, the only restriction imposed was for Tate not to lift above shoulder level with his right arm.
Tate continued complaining about soreness and a "locking or catching" sensation in his right shoulder. As a result, on August 12, 1992, Dr. Edwards performed an arthroscopy and a bursoscopy to evaluate the internal structures of Tate's right shoulder. Dr. Edwards concluded Tate's joint was normal, and he remained confident he made a perfect repair. Dr. Edwards' operative report dated August 12, 1992, listed Tate as partially disabled for his right shoulder and arm. Another report by Dr. Edwards indicated Tate's shoulder pain was radiating from the neck injury.
Despite Tate's continued complaints of pain, Dr. Edwards again informed the defendants that Tate could return to work. On October 4, 1992, Dr. Edwards informed the defendants that Tate could continuously lift and carry objects under twenty pounds, and, could occasionally lift and carry objects over one-hundred pounds. But, he said, Tate could only occasionally push or pull objects, and reach above his shoulder.
Dr. Wiseman continued to treat Tate's neck injury contemporaneously with Dr. Edwards' treatment of Tate's shoulder injury. Dr. Wiseman never satisfactorily resolved Tate's neck injury; therefore, Tate visited Dr. Ramos for the second time on September 24, 1992.
Dr. Ramos then ordered additional EMG and nerve conduction studies. The doctor who performed those studies said Tate had a bilateral carpal tunnel syndrome. Then, based upon those studies, Dr. Ramos also diagnosed Tate as having a cervical radiculopathy syndrome. Dr. Ramos recommended that Tate undergo the simpler carpal tunnel release before undergoing any other surgical interventions.
Prior to that time; back in June 1992, Tate retained an attorney and instituted this action in the Office of Worker's Compensation. In his claim, he acknowledged that the defendants *267 had been paying for most of his medical treatment, but, alleged they refused to pay for his chiropractic care. He also alleged that the defendants had been paying his weekly benefits in an untimely manner.
On July 22, 1992, the defendants informed Tate's counsel that Dr. Edwards had released Tate to light duty work with restrictions. They also informed counsel that they had light duty work available for Tate. The defendants contacted Tate's counsel again on September 14, 1992, and informed him about the available light duty work. Tate never responded to the defendants' request for him to return to work.
On October 10, 1992, the defendants terminated all of Tate's benefits. They based their decision to do so upon the fact that Dr. Edwards had released Tate to light duty work, they had light duty work available for Tate, and Tate failed to accept the available work. The defendants also considered that Dr. Wiseman had previously released Tate on February 24, 1992, and that Dr. Edwards informed them that Tate's maximum medical recovery date was September 11, 1992.
Mr. Tate claims that in December 1992, he attempted to throw a football and, again, aggravated his right shoulder and neck injury. This time, the pain was great, and he felt a "pop" in his shoulder. Dr. Edwards re-examined Tate on December 21, 1992 and gave him another injection. Then, by February 1993, Dr. Edwards released Tate in regard to the shoulder injury.
On February 19, 1993, the Office of Workers' Compensation conducted the hearing on this matter. The hearing officer, after holding the record open to receive deposition testimony, rendered judgment on May 27, 1993, rejecting Tate's demands. Tate appealed alleging the hearing officer committed manifest error.

DISCUSSION
The hearing officer denied Tate additional worker's compensation benefits because she determined the preponderance of the evidence did not indicate that, after October 10, 1992, Tate continued to be disabled and unable to return to work.
It is a well-settled legal principle that the factual findings in workers' compensation cases are entitled to great weight. Reasonable evaluations of credibility and reasonable inferences of fact will not be disturbed even though the appellate court may feel that its own evaluations and inferences are as reasonable. The trier of fact's factual determinations shall not be disturbed in the absence of a showing of manifest error. When the trier of fact's findings are reasonable in light of the entire record, an appellate court may not reverse a choice between two permissible views of the evidence. Therefore, the appellate standard of review applicable to workers' compensation hearing officer's findings and judgments is the manifest error-clearly wrong test.
Shelton v. Wall, 614 So.2d 828, 831-32 (La. App. 2 Cir.1993) (citations omitted).
Initially, Tate had the burden of establishing a work-related injury by a preponderance of the evidence. Shelton v. Wall, supra. Whether he met his burden depends on the totality of the evidence, including lay and medical testimony. DeFatta v. General Motors Corp., 605 So.2d 616 (La.App. 2 Cir. 1992).
In the instant case, the record shows Tate immediately reported the instant accident to his employer on the day it occurred. At that time, he began complaining about pain in the right side of his neck and right shoulder. Dr. Wiseman testified that Tate's present injuries are consistent with the instant October 3, 1991 job related accident described by Tate. However, Dr. Wiseman stated that he relied on the medical history given to him by Tate in reaching that conclusion. He further stated that Tate never told him about any pre-existing neck and headache conditions.
Among the pre-existing injuries Tate has suffered from, are the following: In the early 1970's, Tate injured his left knee. As a result, in 1974 he had an open meniscectomy surgery performed. In 1981, Tate injured his right knee. As a result of that injury, he had two arthroscopic surgeries performed.
Then, on April 10, 1987, Tate injured his left shoulder, his lower back, his neck, and he *268 reinjured both of his knees. The main injury, though, was to his left shoulder; it would "lock up" or "catch." Tate also experienced numbness in his left hand. As a result of the 1987 accident, arthroscopic surgery was performed on Tate's left shoulder.
After the arthroscopic surgery, EMG and nerve conduction studies revealed that Tate's left arm was normal. At that time, Tate's treating physician opined that Tate exaggerated the degree of pain he was enduring. Then, by January 10, 1989, Tate reached maximum medical improvement.
Despite evidence in the form of a medical history showing Tate complained about neck pain in 1987, Tate denied that he injured his neck in the April 1987 accident. He said he hit his head and only complained about having headaches. Additionally, he said his left shoulder injury had resolved before the October 3, 1991 accident.
Prior to the hearing in this matter, Dr. Wiseman briefly reviewed the medical reports concerning Tate's previous neck and shoulder injuries. Based on those reports, Dr. Wiseman opined that Tate's current right-hand side injuries were not the result of any pre-existing conditions. He reached that conclusion because the previous medical reports did not indicate any objective or subjective findings of radicular pain or nerve root problems. However, after defense counsel pointed out that the previous medical reports showed that Tate had numbness and cervical pain, Dr. Wiseman changed his testimony and admitted that it was possible that Tate's current problems could have been caused by a pre-existing condition. But, because Tate's prior complaints only concerned the left side of his body, Dr. Wiseman still believed Tate's current condition is unrelated to the pre-existing conditions.
Dr. Wiseman also compared a 1987 MRI study with the MRI study requested by Dr. Ramos. He said that the 1987 MRI study did not indicate any degenerative changes, whereas, the Ramos MRI study indicated Tate had degenerative changes at the C4-C5 and C5-C6.
Dr. Ramos testified that the changes in Tate's spine at the levels of C4-C5, C5-C6 were slight spondylitic changes. He said those changes were caused by osteophytes and a mild indentation (resulting from mechanical pressure) in the dural sac.
On the one hand, Dr. Ramos said the changes caused by the osteophytes probably occurred a long time ago and, thus, pre-existed the instant work related accident. He said the changes caused by the indentation could have occurred recently; but, he could not conclude when they occurred.
Additionally, Dr. Ramos explained that syndromes, like the ones Tate evidences, are groups of symptoms and signs that can be triggered by a number of different things. In contrast, he further explained that diseases are groups of symptoms and signs that can only be triggered by one specific thing. Then Dr. Ramos stated that Tate's syndromes could have been caused by a number of things, including the October 3, 1991 work accident. However, he said that, even if Tate's problems were pre-existing injuries, the October 3, 1991 accident could have aggravated them. Moreover, based upon the nature of Tate's complaints, he believed that Tate's left side carpal tunnel was not related to the work accident.
In Louisiana it is well settled that an employee's disability is compensable if a pre-existing condition or disease is activated or precipitated into a disability manifestation as a result of work:
A plaintiff-employee's disability will be presumed to have resulted from an employment accident if before the accident the plaintiff-employee was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves, provided that the evidence shows that there is a reasonable possibility of causal connection between the accident and the disabling condition. [Citations omitted]. This presumption is not a conclusive one; rather, it compels the defendant to come forward with sufficient contrary evidence to rebut it.
Doucet v. Baker Hughes Production Tools, (La.1994), 635 So.2d 166, 167-68 (quoting Hammond v. Fidelity & Casualty Co. of New York, 419 So.2d 829, 831 (La.1982)).
*269 The evidence in this case easily shows that Tate sustained a work-related injury, or a work-related aggravation of a pre-existing condition. All of Tate's previous complaints concerned the left side of his body. He did not begin complaining about the right side of his body until immediately after the October 3, 1991 work related accident. The defendants did not present any contrary evidence. The possibility of a causal connection between the work accident and Tate's disabling condition is reasonable. Therefore, we find Tate met his burden of establishing a work-related injury by a preponderance of the evidence. He was entitled to receive benefits during the time he was unable to work as a result of this work related injury.
The issue in this case is whether Tate was entitled to receive any additional benefits after October 10, 1992. The facts of this case do not fall within the category of permanent total disability. Nor, after October 10, 1992, do they establish that he suffered from a temporary total or permanent partial disability.[1] The hearing officer was not clearly wrong in her ruling in this regard. Therefore, we need only address the question of Tate's entitlement to supplemental earnings benefits (SEB). See Brown v. Blue Grass Liquor Co., (La.App. 2d Cir.1994), 632 So.2d 904, 909.
Under LSA-R.S. 23:1221(3), the employee is entitled to supplemental earning benefits if the injury has resulted "in the employee's inability to earn wages equal to ninety percent or more of wages at time of injury..." The injured employee thus bears the burden of proving, by a preponderance of the evidence, that the injury resulted in his or her inability to earn that amount under the facts and circumstances of the individual case.
Freeman v. Poulan/Weed Eater, (La.1994), 630 So.2d 733 (citations omitted) (footnote omitted).
In regard to the employee's earning capability, the amount of wages he could have earned in any employment while working in any pain, which he was physically able to perform, and which was offered to him by his employer, is considered when determining whether he can earn at least ninety percent of the wages at time of injury. LSA-R.S. 23:1221(3)(c)(i). However, the employer bears the burden of establishing the employee's earning capability.[2]
After the employer meets his burden of proving the injured employee is capable of earning at least ninety percent of wages at time of injury, the employee still has an opportunity to demonstrate he is incapable of performing the employment available to him. In order to meet this burden, the employee must establish by clear and convincing evidence, unaided by any presumption of disability, that solely as a consequence of substantial pain, he cannot perform employment available to him. LSA-R.S. 23:1221(3)(c)(ii); Paul v. Gipson, 614 So.2d 1275 (La.App.2d Cir.1993).
In the instant case, Tate testified that he could not perform any work. He said, as a result of the instant work related accident, his neck was, and still is, in continuous pain. He said if he stands or sits for a long period of time, he "kind of get[s] disoriented ... *270 from the pain." He also said the pain affects his mental concentration and renders him unable to work. However, Tate admitted he could do light yard work and rake his yard for short periods of time.
Dr. Edwards is the primary physician who evaluated Tate's right shoulder injury. He concluded that Tate had a torn rotator cuff, and he testified by deposition that he repaired that injury. Furthermore, Dr. Edwards said, Tate could have returned to light duty work before October 10, 1992. He said, from an orthopaedic standpoint, Tate did not need any more aggressive treatment. However, Dr. Edwards made it clear that his release of Tate was only in regard to Tate's shoulder.
The record also indicates that Dr. Edwards advised the defendant-insurer that Tate could continuously lift and carry objects that weighed up to twenty pounds, he could frequently lift and carry objects that weighed between twenty pounds and fifty pounds, and he could occasionally lift and carry objects that weighed one hundred pounds or more. However, Dr. Edwards also advised that Tate could only occasionally push or pull objects, and reach above his shoulder.
Dr. Ramos evaluated Tate's neck injury and requested the studies which ultimately revealed that Tate had a mild bilateral carpal tunnel syndrome and a cervical radiculopathy syndrome. Dr. Ramos testified by deposition that when he first examined Tate on January 28, 1992, Tate could not perform light duty work. He further testified that upon his second examination of Tate on September 24, 1992, and his subsequent examinations on November 12, 1992, and January 7, 1993, Tate's condition had not changed. That suggests that Tate remained unable to perform light duty work after October 10, 1992. However, the record does not reveal any specific restrictions imposed upon Tate by Dr. Ramos.
Dr. Wiseman is the primary doctor who treated Tate's neck injury. He testified that because he continually found objective evidence of splinting spasms with radicular symptoms, he did not believe Tate was physically or mentally capable of doing any work. He said, "[I] believe [Tate was in] persistent pain. And, when people have chronic, persistent pain, they get a little bit strange," and "[t]hey don't act like normal people." Moreover, Dr. Wiseman also said, in regard to Tate's neck injury, Tate was, and still is, completely disabled and unable to return to employment.
However, after being questioned by the hearing officer, Dr. Wiseman admitted that Tate was not functionally limited. He even said Tate could, albeit with pain, bend, stoop, turn his head, and use his muscles. Moreover, Dr. Wiseman further admitted that he did not know what type of work had been offered to Tate.
Mark Beisecker, safety engineer for L & A Contracting, testified via telephone deposition. He said Tate's prior job duties as a welder/light duty operator included sitting, standing, shifting gears, lifting, driving equipment and operating equipment. Beisecker also testified that L & A Contracting had an aggressive light duty program and would structure a job for Tate, including sitting at a desk and answering telephones, in order to satisfy any limitations Tate's treating physician imposed.
Beisecker further testified that light duty work was available for Tate and that L & A Contracting offered it to him. Moreover, Beisecker said the light duty work offered to Tate paid the same rate of pay Tate earned before the accident. Tate does not deny L & A Contracting offered light duty work to him; rather, he admits it did so. The defendants testimony in this regard is uncontradicted.
The evidence shows Tate was not engaged in any employment or self-employment, and, consequently, he was earning less than he was capable of earning. Therefore, the amount determined to be the wages he was able to earn is the amount he would have earned had he accepted the job offered to him. Since the job offered Tate would have paid him at the same rate of pay he had been receiving, Tate's earning capability exceeded ninety percent of the wages he earned at the time of his injury. For that reason, Tate was not entitled to any SEB.
*271 Based of the record reviewed in its entirety, we find no manifest error in the hearing officer's judgment finding Tate no longer entitled to benefits after October 10, 1992. Since the record shows Tate's earning capacity exceeded ninety percent of the earning capacity he had at the time of the injury, we pretermit the question of whether Tate met his initial burden of proving his entitlement to SEB.
We note, although Tate testified he is in pain, he had the burden of proving by clear and convincing evidence that such pain was substantial before he would be deemed incapable of performing the employment offered to him. Dr. Wiseman said Tate was not functionally limited but did experience pain. However, Dr. Wiseman did not testify about the amount of pain Tate would endure working in the job offered by his employer. Moreover, neither Dr. Edwards nor Dr. Ramos testified about the amount of pain Tate endured or would have experienced had he gone back to work. Furthermore, even Tate himself admitted he could perform yard work, at least for short periods of time.
Additionally, Tate's credibility was impeached at trial. During a deposition, defense counsel requested Tate to disclose all accidents; "even [accidents which occurred] outside the work place," and "any time [Tate] had to go see a physician for an accident." When Tate responded, he failed to tell defense counsel about the 1974 knee injury and the resulting surgery. After being impeached at trial, Tate said the reason he did not disclose the 1974 knee injury was because he thought defense counsel only wanted to know about job-related accidents.
Also, Tate admitted he never told either Dr. Ramos or Dr. Edwards about the December 21, 1992 automobile accident and the resulting back injury. He said the reason he did not tell them about that injury was because Dr. Wiseman had already adjusted his back and he was feeling better before he ever saw them. Additionally, Tate admitted he never told Dr. Edwards about the pre-existing headaches he had been having. The hearing officer considered Tate's testimony in regard to the nature of his complaints and inability to work to be unimpressive. And, because Tate gave an incomplete and inaccurate medical history to his doctors, the hearing officer did not find the medical testimony to be impressive.
When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.
Rosell v. ESCO, 549 So.2d 840, 844-45 (La. 1989) (citations omitted).
In the instant case, the hearing officer did not find that Tate demonstrated by clear and convincing evidence that he was in substantial pain and, thus, incapable of performing the work offered to him. We find no manifest error in the hearing officer's judgment which found that after October 10, 1992, Tate was no longer disabled and unable to work as a result of the work accident.
Arbitrary and capricious claim
Tate alleged that the defendants paid his weekly benefits in an untimely manner. He testified that it took about five months before he ever received his first check. He also testified that he never received any of his checks at regular intervals; he said he always received his checks two or three weeks late.
LSA-R.S. 23:1201 provides:
A. Payments of compensation ... shall be paid as near as may be possible, at the same time and place as wages were payable *272 to the employee before the accident; however, when the employee is not living at the place where the wages were paid, or is absent therefrom, such payments shall be made by mail, upon the employee giving to the employer a sufficient mailing address.
B. The first installment of compensation payable for temporary total disability ... shall become due on the fourteenth day after the employer or insurer has knowledge of the injury....
E. Whenever the employee's right to such compensation or medical benefits has been reasonably controverted by the employer or his insurer, the penalties set forth in this Subsection shall not apply.
In regard to the timeliness of Tate's weekly benefit checks, we note neither Tate nor the defendant-insurer offered any objective evidence to show when Tate's benefit checks were paid. More importantly, Tate did not unequivocally prove that more than fourteen days elapsed between the date the defendants obtained knowledge of his injury and the date the defendants paid him. Although he testified that it took about five months before he received his first check, it is not clear from his testimony when he first applied for workers' compensation benefits and informed the defendants about his disability.
Moreover, Joe Gardner, the superintendent for L & A Contracting, testified that Tate reported the accident and injuries on the day they occurred. On Friday, October 4, 1991, Gardner accompanied Tate to the hospital to seek medical treatment from Dr. Haynes. After leaving the hospital, Tate returned to work and completed that work day.
The following Monday, October 7, 1991, the defendant-employer laid Tate off for three days because of a work shortage. Then, on Thursday, October 10, 1991, Tate returned to the job site to pick up his check. At that time he informed the defendant-employer that he had another job. Tate then returned all of his equipment to the defendant-employer. After that date, Gardner did not hear from Tate again. Thus, it appears the defendants did not know about Tate's disability.
Additionally, the record indicates that Tate was involved in an automobile accident on December 21, 1991. Although it is not clear whether Tate operated the vehicle at that time, the circumstances indicate that he was physically active and able to get around. Based on this record, the defendants reasonably controverted Tate's entitlement to compensation benefits. Therefore, the penalties set forth in LSA-R.S. 23:1201 are not applicable.
Tate also alleged that the defendants were arbitrary and capricious in terminating his benefits after October 10, 1992. However, as noted above, Tate was not entitled to any benefits after October 10, 1992. Consequently, the defendants were not arbitrary and capricious in terminating Tate's benefits after that date.
Tate also alleged that the defendants were arbitrary and capricious in refusing to pay for his chiropractic care. In that regard, LSA-R.S. 23:1203 requires employers to furnish all necessary medical and non-medical treatment to an employee injured in a work-related accident. Lynn v. Berg Mechanical, Inc., 582 So.2d 902, 912 (La.App. 2 Cir.1991). More particularly, "[w]hen the accident's relationship to the injury is unquestioned, and chiropractic treatments are determined beneficial and necessary, the employer is responsible for expenses incurred for such treatment." Id. at 913 (citation omitted). The injured employee bears the burden of proving by a preponderance of the evidence that the treatment was related to his work-related injury. Id.
After the employee meets his initial burden, he must prove that the employer or its insurer acted arbitrarily and capriciously, or without probable cause in refusing to pay for the treatment. In that regard, LSA-R.S. 23:1201.2 provides:
Any insurer liable for claims ... shall pay the amount of any claim due ... within sixty days after receipt of written notice. Failure to make such payment within sixty days after receipt of notice, when such failure is found to be arbitrary, capricious, *273 or without probable cause, shall subject... insurer, in addition to the amount of the claim due, to payment of all reasonable attorney's fees for the prosecution and collection of such claim.

.... .
In the instant case, the defendant-insurer decided not to pay Dr. Wiseman for the chiropractic care rendered to Tate. As early as May 5, 1992, Dr. Wiseman had requested written approval or denial of the treatment he rendered. The defendant-insurer returned Dr. Wiseman's correspondence marked "unauthorized and denied." Dr. Wiseman also testified that Carolyn Calvin, the defendant-insurer's claims adjuster, told him that the insurer had no intention of paying for his chiropractic services.
Subsequently, the defendant-insurer requested Intracorp to review the chiropractic services rendered to Tate. Intracorp reviewed the services which were rendered between January and June 1992. On August 13, 1992, Intracorp reported its findings to Ms. Calvin. It concluded that Dr. Wiseman's chiropractic treatment was reasonable and necessary and recommended that the defendant-insurer pay $3,266.00 of Dr. Wiseman's $3,712.00 chiropractic bill. Moreover, according to the Intracorp report, Dr. Edwards also agreed that Dr. Wiseman's chiropractic treatment was reasonable.
Additionally, Tate's previous neck complaints had subsided before October 3, 1991 accident. He did not begin complaining about neck pain until immediately after the instant work related accident. Although Tate initially sought chiropractic care for his back injury, all chiropractic care rendered after his first visit with Dr. Wiseman was for his neck pain. Thus, the record shows that Tate's chiropractic care was reasonably related to a compensable work-related injury or work-related aggravation of a pre-existing injury.
Moreover, although the chiropractic treatment was palliative rather than curative, the treatments relieved Tate's neck pain for up to five days at a time. This evidence supports a finding that the chiropractic treatments were beneficial and necessary. Accordingly, the defendant-insurer is responsible for Tate's chiropractic care related to treatment for his neck injury. The hearing officer's judgment to the contrary is manifestly erroneous.
We note several medical reports show that Tate had suffered from neck problems prior to the instant work related accident. Also, the defendant-insurer knew that Tate initially sought chiropractic care for a lower back injury which resulted from a non-work related automobile accident. Dr. Wiseman testified that the automobile accident could have possibly caused Tate's neck pain; but, it was his opinion that the fall was the "major contributing factor." The evidence in this case shows that the employer had a reasonable basis for questioning whether the October 3, 1991 fall was the cause of the neck injury. Therefore, the defendant-insurer's failure to pay for Tate's chiropractic care was not arbitrary, capricious, or without probable cause.
For the foregoing reasons, we amend the hearing officer's judgment to award to Tate $3,266.69, the amount owed Dr. Wiseman. The judgment denying Tate compensation benefits after October 10, 1992, is affirmed as amended. Costs here and below are assessed to one-half to each party.
AFFIRMED AS AMENDED.

APPLICATION FOR REHEARING
Before MARVIN, SEXTON and BROWN, JJ., and PRICE and JONES, JJ. Pro Tem.
Rehearing denied.
NOTES
[1] Permanent total disability payments and SEB payments are not parallel remedies. "This is made clear by the language of the statute itself which provides that in order to recover benefits under the permanent total disability section, the claimant must be totally physically unable to engage in any type of employment. La.R.S. 23:1221(2). SEB payments, on the other hand, presuppose that the claimant can work. Not only is the section on SEB payments phrased in terms which infer an ability to work, i.e. "... is able to earn ...," but calculations in decisions awarding SEB payments are made on the basis of what the claimant is capable of earning." Watson v. Amite Mill. Co., Inc., 560 So.2d 902, 905 (La.App. 1 Cir.), writ denied, 567 So.2d 614 (1990).
[2] "Once the employee's burden is met, the burden of proof then shifts to the employer, who, if he wishes to contend that the employee is earning less than he is able to earn so as to defeat or reduce supplemental earnings benefits, bears the burden of proving that the employee is physically able to perform a certain job and that the job was offered to the employee or that the job was available to the employee in his or the employer's community or reasonable geographic region. The amount of supplemental earnings benefits are then based on the difference between the average weekly wage and the plaintiff's earning capacity after the injury." Freeman v. Poulan/Weed Eater, supra (citations omitted).