681 So.2d 971 (1996)
Scott A. HAGAN, Plaintiff-appellee,
v.
LSU MEDICAL CENTER, Defendant-appellant.
La. C.C.P. No. 28,669-CA.
Court of Appeal of Louisiana, Second Circuit.
September 27, 1996.
*973 Piper and Associates by Robert E. Piper, Jr., Ramon Lafitte, for Defendant-Appellant.
Jack M. Bailey, Jr., Assoc. by J. Allen Cooper, Jr., for Plaintiff-Appellee.
Before MARVIN, HIGHTOWER and CARAWAY, JJ.
CARAWAY, Judge.
LSU Medical Center in Shreveport (LSUMC) appeals from a workers' compensation hearing officer's decision awarding its former employee, Scott Hagan, temporary total disability benefits and reimbursement for medical bills. For the reasons expressed we reverse the award of temporary total disability benefits, affirm the medical reimbursement award, award supplemental earnings benefits without discount from August 23, 1992 to April 30, 1993, and remand for an evidentiary hearing on the issue of additional supplemental earnings benefits and rehabilitation that might be appropriate following May 1, 1993.

FACTS
Scott Hagan, a 35 year old carpenter employed by LSUMC from 1985 to 1992, injured his groin on March 8, 1990 while attempting to remove a cabinet encased between two walls. Hagan's physician prescribed pain medications and antibiotics, and Hagan missed one week of work. As a result of this minor incident, Hagan incurred medical bills of approximately $130 which LSUMC apparently paid. Hagan returned to work and completed his assigned carpentry tasks in a satisfactory manner over the next two years. Between 1990 and 1992, Hagan required neither medication nor physical therapy to enable him to continue his employment as a carpenter which required daily heavy lifting. Elton Broadway, Hagan's supervisor, awarded him satisfactory service ratings on May 2, 1990, April 25, 1991, and March 30, 1992. None of these annual reports reflect that Hagan suffered from a physical disability that impaired his job performance. To the contrary, Broadway testified that Hagan had no difficulty performing his job during the two years between March 8, 1990 and August 21, 1992.
On August 21, 1992, Hagan suffered another injury while moving a large cabinet. The cabinet measured approximately fourteen feet long and five feet high and had to be moved in two pieces. As Hagan and several other men attempted to move one half of the cabinet into place, it momentarily lodged in a doorway. While pulling on the cabinet in an attempt to dislodge it, Hagan suffered an injury which resulted in pain to his right leg, hip, and lower back. Hagan reported the injury to his supervisor, Elton Broadway, who documented the injury as a recurring problem related to the 1990 incident. Hagan denies this contention and explained that when he reported the 1992 injury to Broadway he probably said something to the effect of "remember when I hurt myself, well I have hurt myself again."
Pursuant to Mr. Broadway's instructions, Hagan went to the Employee Health Center at LSUMC. The physicians in the health center referred Hagan to the Urology department. The Urology department recommended Hagan visit a surgeon but did not refer him to a specific physician. On his own volition, Hagan made an appointment with a surgeon, Dr. Charles Byrd, who determined that Hagan was not suffering from a hernia. Dr. Byrd referred Hagan to Dr. Joffrion, an orthopedic surgeon who was not employed by LSUMC. Because LSUMC would not assure insurance coverage, Hagan was unable to make an appointment with Dr. Joffrion.
Over the next several months thereafter, Hagan participated in physical therapy, visited the pain clinic for injections, and received an MRI and nerve conduction test through the orthopedic and neurology departments. All of Hagan's treatment occurred at LSUMC. LSUMC billed Hagan for these services and at trial the bills remained unpaid. During this attempted rehabilitation, Hagan was referred to Dr. Mary McWilliams. On February 12, 1993, approximately six months after the second accident, Dr. McWilliams, a neurologist and occupational *974 disease expert employed by LSUMC, diagnosed Hagan with an injured piriformis muscle, the muscle that connects the pelvic girdle to the thigh and crosses the sciatic nerve. Following her initial examination, Dr. McWilliams prescribed physical therapy particularized for restoring the injured muscle, muscle relaxers, and pain medication. Based upon her initial review and diagnosis, she held the opinion that Hagan was not able to return to work. On February 17, 1993, Dr. McWilliams' examination revealed that Hagan's pain had decreased significantly and he had regained full range of motion; however, he still suffered from some pain and walked with a limp. Dr. McWilliams maintained that Hagan could not return to work at this time.
On March 19, 1993, Dr. McWilliams significantly reduced Hagan's pain medication and noted improvement in Hagan's condition. She summarized her perception of Hagan's health following his March 26 visit by stating:
At that time he was re-examined. He was able to move actively and passively without pain. He could squat down on the floor and get back up without any help or any muscle spasms. He could touch his toes. His power seemed good. And at that time I had recommended sending him back to physical therapy for Work Hardening so he could come back to work.
Dr. McWilliams testified that the accident in August, 1992 aggravated the injury suffered by Hagan in 1990 and resulted in his inability to work. In March of 1993, Dr. McWilliams opined that Hagan might have been able to return to work after four weeks of work hardening. However, she clearly stated that without the prescribed physical therapy, re-injury was likely and Hagan might miss as much as three more months of work. Hagan testified that at some point during Dr. McWilliams' treatment, she encouraged him to return to light duty carpentry work.
When Hagan thereafter requested to return to work as a carpenter on light duty, LSUMC refused this request asserting the carpentry and cabinet making divisions did not offer light duty. When Hagan was unable to return to work after exhausting his annual leave and his sick leave, LSUMC terminated him.
David Rood, LSUMC's workers' compensation claims adjuster, determined Hagan's 1992 complaints were related to the 1990 accident and advised LSUMC that Hagan's claim for temporary total disability (TTD) benefits had prescribed. Mr. Rood based his determination and recommendation on the fact that Hagan's medical records indicated he suffered an on-the-job injury in 1990. Mr. Rood determined that the occupational injury report filled out in 1992 was an attempt to report injuries connected with the 1990 injury; however, he admitted on cross examination that none of Hagan's employee records revealed any significant medical problems after he returned to work in 1990 until August 1992.
Because of Rood's assessment, no workers' compensation benefits were paid to Hagan. Throughout this six month period prior to Dr. McWilliams' diagnosis, Hagan was relegated to examination by the physicians employed by LSUMC instead of any other physician he might have chosen. Additionally, Hagan was forced to utilize his employment benefits as his only income during this time as he remained hopeful of continuing his seven year employment with LSUMC. Finally, just when it appeared that Hagan was ready to participate in work hardening and light duty carpentry work his treatments were terminated. Hagan testified that Dr. McWilliams advised him that she could no longer treat him because he was not a workers' compensation candidate. Dr. McWilliams stated that after she prescribed work hardening Hagan did not return to her office; however, she offered no explanation for his sudden departure. LSUMC neither refuted Hagan's contention that he was denied therapy nor did LSUMC allege that Hagan chose not to continue treatment from Dr. McWilliams
Although Hagan testified he could not return to work as a carpenter, even following the treatment he received under Dr. McWilliams, he stated: "I have to watch what I do. There's plenty things I can do. I mean, I ain't never said I was crippled, you know, I can't do anything." Hagan and his wife admitted *975 he had worked as a painter on two or three occasions since 1994 and driven a tractor on one occasion in 1995.
Following trial, the workers' compensation hearing officer rendered judgment for plaintiff on his claim of TTD and ordered LSUMC to pay benefits based on an average weekly wage of $765.60[1] as well as all outstanding medical bills. The hearing officer rejected plaintiff's claim for penalties and attorney's fees. LSUMC appeals asserting that Hagan's claims for TTD benefits and medical benefits had prescribed. In the alternative LSUMC asserts Hagan failed to prove by clear and convincing evidence that he was entitled to TTD benefits.

LAW
Compensation benefits are available for claimants who suffer "personal injury by accident arising out of and in the course of" employment. LSA-R.S. 23:1031(A). An employment related accident is "an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration." LSA-R.S. 23:1021(1). An employee's preexisting disease or infirmity does not disqualify his workers' compensation claim if the workrelated injury either aggravated or combined with, the disease or infirmity to produce the disability for which compensation is claimed. Andrews v. Music Mountain Water Co., 25,634 (La.App.2d Cir. 4/6/94), 637 So.2d 571.
The claimant's burden of proof in establishing a causal relationship between a job-related accident and the disability is a preponderance of the evidence. Green v. Conagra Broiler Co., 26,599 (La.App.2d Cir. 3/1/95), 651 So.2d 335. The causal relationship, however, can be established when the employee proves that before the accident he was in good health, but commencing with the accident the symptoms of the disabling condition appeared, and there is sufficient medical evidence to show a reasonable possibility of causal connection between the accident and the disabling condition. Allen v. Misco Paper, 27,146 (La.App.2d Cir. 8/23/95), 660 So.2d 175.
An injured individual seeking TTD benefits must prove by clear and convincing evidence that he is physically unable to engage in any employment or self-employment, regardless of the nature or character of the employment, including but not limited to any and all odd-lot employment, sheltered employment, or employment while working in pain. LSA-R.S. 23:1221(1). To prove a matter by clear and convincing evidence means to demonstrate that the existence of a disputed fact is highly probable, that is, much more probable than its nonexistence. Green v. Conagra Broiler Co., supra.
In Graham v. Georgia-Pacific Corp., 26,165 (La.App.2d Cir. 9/23/94), 643 So.2d 352, this court sustained the denial of TTD benefits to an individual who testified that he could not work because of low back pain. The plaintiff admitted to his physician that he had been working refinishing bathtubs and had been deer hunting approximately 10 times. Additionally, plaintiff's treating and evaluating physicians approved several jobs that were available and within his physical restrictions.
For injuries that do not result in total disability, but rather leave the employee unable to earn 90% of his pre-injury wages, the statute authorizes supplemental earnings benefits (SEB). Supplemental earnings benefits are based on the difference between the pre-injury wages and:
average monthly wages earned or average monthly wages the employee is able to earn in any month thereafter in any employment or self-employment whether or not the same or similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee at the time of injury was particularly fitted by reason of education, training, and experience....
LSA-R.S. 23:1221(3).
In order to recover SEB an employee must show by a preponderance of the *976 evidence that he is unable to earn 90% of his pre-injury wages. If an employee meets his burden, then the burden shifts to the employer to show that the employee is physically capable of work and that work was available in the reasonable geographic area. Brown v. Blue Glass Liquor Co., 25,552 (La.App.2d Cir. 2/23/94), 632 So.2d 904. Once the employer demonstrates the employee is capable of work and appropriate work is available, then the claimant must prove by clear and convincing evidence, unaided by a presumption of disability that he is unable to perform the employment offered. LSA-R.S. 23:1221(3)(c)(ii); See also Adams v. City of Shreveport, 27,284 (La.App.2d Cir. 8/23/95), 660 So.2d 127. Depending upon the parties' responses regarding these burdens of proof, the employee may be entitled to undiscounted, maximum SEB payments, or to SEB payments lowered by a credit to the employer for the proven earnings or potential earnings from available jobs within a reasonable geographic area. See Robin v. Schwegmann Giant Supermarkets, Inc., 93, 2310 (La.App. 1st Cir. 11/10/94), 646 So.2d 1030.
The issue of disability within the framework of the workers' compensation law is a legal rather than a purely medical determination. Augustus v. St. Mary Parish School Board, 95,2498 (La.App. 1st Cir. 6/28/96), 676 So.2d 1144. The standard of appellate review applicable to hearing officers is the same as applies to district courts, manifest error. The issue to be resolved by the appellate court is not whether the hearing officer was right or wrong, but whether the factual conclusion was reasonable. Accordingly, mere conflicts in evidence will not suffice to overturn a hearing officer's reasonable evaluations of credibility and reasonable findings of fact. See Stevens v. Wal-Mart Stores Inc., 27,977 (La.App.2d Cir. 11/1/95), 663 So.2d 543 and cases cited therein. The question of whether the claimant is entitled to compensation benefits is ultimately a question of fact, and the hearing officer's resolution of that issue may not be disturbed by the appellate court in the absence of manifest error or unless clearly wrong. Augustus, supra. The mischaracterization of benefits, i.e. labeling supplemental earnings benefits as temporary total disability benefits, will not undermine the hearing officers' determination that benefits are due.
If an employee suffers personal injury arising out of and in the course of his employment, the employer is obligated to furnish all necessary medical treatment, incurred as a result of the accident, to the injured employee in accordance with statutory guidelines. LSA-R.S. 23:1203; Tate v. L & A Contracting, 26,110 (La.App.2d Cir. 9/21/94), 643 So.2d 263. The phrase "all necessary medical treatment" encompasses any physical therapy that may be required as a result of the job related injury. Bamberg v. City of Shreveport, 26,278 (La.App.2d Cir.12/7/94), 647 So.2d 1207.
Moreover, if the employee suffers an on-the-job injury that precludes him from earning wages equal to his pre-injury wages, the employer is required by law to provide "prompt" rehabilitation services. The goal of rehabilitation is to return the disabled worker to work with a minimum of retraining as soon as possible after an injury. LSA-R.S. 23:1226(A)(B); Freeman v. Poulan/Weed Eater, 93-C-1530 (La.1/14/94), 630 So.2d 733.

DISCUSSION
On this record, we cannot find the hearing officer's determination that Hagan suffered personal injury in August of 1992 by an accident arising out of and in the course of employment to be clearly wrong. Prior to the accident, Hagan performed satisfactorily as a carpenter for seven years. Neither Hagan's supervisor, his personnel records, nor his medical records reflect he suffered from a debilitating injury prior to August, 1992. The vast majority of Hagan's medical expenses were incurred after August, 1992 and several of these medical records reveal the injury to be of recent origin. Dr. McWilliams' examination and treatment of Hagan during February and March, 1993 revealed that Hagan suffered two job related injuries. The first injury required minor medical attention; however, this injury more likely than not made Hagan more susceptible to the on-the-job injury suffered in August, 1992.
*977 Although LSUMC might have reasonably believed Hagan's claim to have been prescribed prior to Dr. McWilliams' diagnosis, following that diagnosis, by a physician employed by LSUMC, LSUMC was placed on notice that Hagan had suffered a job related injury in August, 1992. This injury whether medically related to the 1990 injury or not was compensable under the workers' compensation statute. Contrary to LSUMC's position, the record supports the hearing officer's determination that in August, 1992 there was "an unexpected, actual, precipitous event that happened suddenly and directly produced objective findings of an injury." See LSA-R.S. 23:1021(1).
After a determination that a jobrelated accident produced disability, the issue becomes which type of benefits may be due. Immediately following the accident, LSUMC's employee health center referred Hagan to the Urology department. The examination revealed no urological injury or pathology. In September LSUMC referred Hagan to the Orthopedic Clinic where he was diagnosed with low back pain and probable nerve root pain at L3L4. In October the Orthopedic Clinic reiterated its initial diagnosis, injected Hagan's back with an anti-inflammatory drug, prescribed pain medications, continued physical therapy, and recommended that an MRI might be required to determine the condition of his back.
In December the Orthopedic Clinic referred Hagan to the pain clinic. The pain clinic coordinated the MRI and nerve conduction test. The MRI results were normal; however, the nerve conduction studies revealed a problem with the nerve roots at L-2-3. The medical records indicate Hagan attended his scheduled appointments and therapy sessions, and none of his treating physicians throughout this period charged him with malingering.
In February 1993, Dr. McWilliams diagnosed Hagan with an injured piriformis muscle for the first time. Dr. McWilliams stated that upon her initial examination of Hagan, he was unable to return to work. After approximately two months of treatment aimed at restoring the injured muscle, Dr. McWilliams recommended Hagan return to light duty carpentry and begin a work hardening program.
In order to receive TTD benefits under the current statute, an injured worker must prove by clear and convincing evidence that he is unable to engage in any employment or self employment. An injured worker who may return to work in any capacity regardless of some degree of pain will nevertheless probably be disqualified from receiving TTD benefits. Malone & Johnson, 13 Louisiana Civil Law Treatise § 275, at 709, 710 (3d ed.1994). While the record in this case does clearly indicate that prior to the time of receiving the diagnosis and treatment under the care of Dr. McWilliams the plaintiff continued to suffer significantly from his injury, we do not find clear and convincing evidence that Hagan was unable to engage in any employment. Therefore, while not undermining the hearing officer's determination that benefits were due, we amend the ruling and find that SEB, instead of TTD benefits, are owed to the plaintiff.
As to the issue of whether plaintiff's SEB payments should be discounted or subject to any credit in favor of LSUMC for Hagan's other possible earnings, we first note that the claim for SEB payments was expressly identified in the plaintiff's pleadings and in the pre-trial statement for the case. At trial Hagan proved to the satisfaction of the hearing officer that at least through the time of Dr. McWilliams' recommended rehabilitation and work hardening program or approximately April 30, 1993, he remained unable to earn at least 90% of his pre-injury wages. In the face of that evidence, LSUMC offered no proof of the availability of work nor, more importantly, of the amount of any part-time or fulltime employment which the plaintiff might have been able to have obtained and performed. Therefore, on the basis of LSUMC's failure to meet its burden of proof in this regard, we award Hagan undiscounted SEB payments through April 30, 1993.
Nevertheless, in view of plaintiff's improvement which did occur after Dr. McWilliams' preliminary treatment and his admission of an ability to work at least in other jobs thereafter, we remand the case for an evidentiary hearing to determine the appropriate *978 amount of SEB payments due after April 30, 1993 and to determine the necessity of rehabilitation services and physical therapy. LSA-R.S. 23:1221(3), 1226 and 1203; Hinton v. Scott Hydraulics, Inc., 614 So.2d 820 (La.App. 2d Cir.1993); and Thomas v. Sears, Roebuck and Co., 94-2003 (La.App. 4th Cir. 3/29/95), 653 So.2d 102.
In accordance with LSA-R.S. 23:1021(10) and LSA-R.S. 23:1221(3) Hagan's supplemental earnings benefits are calculated as follows: Hagan's average weekly wage at the time of the accident was $382.80. Using the conversion figure of 4.33 provided by statute, we determine Hagan's average monthly wage to be $1,657.52. Because he was unable to earn 90% of this amount, he is entitled to sixty six and two thirds percent of the difference between his average monthly wage at the time of the injury and the average monthly wages he is able to earn after the injury. Sixty Six and two thirds percent of Hagan's average monthly wage $1,104.90.

CONCLUSION
For the reasons expressed above, the award of temporary total disability benefits is REVERSED, the award of medical reimbursement is AFFIRMED, plaintiff is AWARDED supplemental earning benefits without discount in the amount of $1,104.90 per month through April 30, 1993, and the case is REMANDED to the hearing officer for an evidentiary hearing on the issue of whether plaintiff is entitled to supplemental earnings benefits or rehabilitation after April 30, 1993.
NOTES
[1] The record reflects Hagan earned $382.80 per week. The hearing officer erroneously calculated the award based on the amount Hagan earned every two weeks.