861 So.2d 721 (2003)
Edward DANIEL, Jr.
v.
NEW ORLEANS PUBLIC SERVICE INC., et al.
No. 2002-CA-2427.
Court of Appeal of Louisiana, Fourth Circuit.
December 3, 2003.
Rehearing Denied January 15, 2004.
*722 Marie Riccio Wisner, New Orleans, LA, for Plaintiff/Appellant.
Kenneth P. Carter, Joseph K. West, Margaret Jenkins Savoye, Entergy New Orleans, Inc., New Orleans, LA, for Defendant/Appellee.
(Court composed of Judge PATRICIA RIVET MURRAY, Judge JAMES F. McKAY, III, Judge DAVID S. GORBATY).
PATRICIA RIVET MURRAY, Judge.
The plaintiff appeals the trial court's judgment dismissing his petition for worker's *723 compensation benefits. For the reasons that follow, we affirm.

FACTS AND PROCEEDINGS BELOW
The original plaintiff, Edward Daniel, Jr., filed the instant lawsuit on April 4, 1987 against his employer, New Orleans Public Service, Inc. ["NOPSI"], seeking benefits for permanent total disability, as well as penalties for NOPSI's alleged arbitrary and capricious failure to pay said benefits. Plaintiff alleged that he had experienced three injury-causing accidents while working as a master mechanic/welder/pipe fitter: (1) On January 29, 1986, Mr. Daniel lost his grip on a boiler tube he was replacing, and it fell and struck him in the head; (2) On May 27, 1986, he snapped his neck and injured his back while pulling on pipe wrenches; and (3) On July 30, 1986, he became dizzy, slipped, and fell, injuring his back. According to the record, Mr. Daniel ceased working completely on August 7, 1986.[1]
On September 29, 1986, Mr. Daniel filed a complaint with the Office of Workers' Compensation ["OWC"] reporting his January 29th injury.[2] On October 30, 1986, the OWC issued a recommendation in response to the complaint; the recommendation was that no disability benefits were owed, but that medical expenses should be paid by the employer. Contemporaneous with the first recommendation, the OWC also issued separate recommendations for the May 27th and July 30th injuries.[3] Regarding the May 27th incident, the OWC recommended that only medical expenses be paid; however, with regard to the July 30th injury, the recommendation was that NOPSI should pay medical expenses plus temporary total disability benefits in the amount of $254.00 per week from October 8, 1986 until Mr. Daniel was "physically able to return to gainful employment." NOPSI never disputed Mr. Daniel's entitlement to medical expenses, which are not the subject of the instant case; NOPSI declined, however, to pay Mr. Daniel any workers' compensation disability benefits.
Mr. Daniel never returned to gainful employment. With the workers' compensation dispute unresolved, he applied for non-occupational long-term disability benefits from NOPSI's insurance carrier, Connecticut General Life Insurance Company ["CIGNA"]. On December 19, 1986, NOPSI sent Mr. Daniel a letter informing him that by extending his sick leave and combining it with his vacation time, NOPSI had arranged for him to continue receiving his pay through February 10, 1987. On February 3, 1987, NOPSI was notified by CIGNA that Mr. Daniel had been conditionally approved for long-term disability benefits, which he began to receive as of February 11, 1987. The insurance carrier noted that Mr. Daniel would have to submit to an independent medical exam ["IME"] to confirm his continued eligibility for those benefits. Mr. Daniel continued to receive those benefits until June 30, 1987, when the benefits were terminated because Mr. Daniel had failed to show up for the IME scheduled in *724 March. On the same date, NOPSI also terminated Mr. Daniel's employment. The record shows that Mr. Daniel subsequently sought a review of the termination of benefits, but the termination was ultimately reconfirmed because Mr. Daniel failed to show up for a second IME scheduled on July 22, 1987.
On April 4, 1987, while he presumably was still receiving long-term disability benefits, Mr. Daniel filed the instant workers' compensation action seeking permanent total disability benefits as a result of the three aforementioned work-related accidents, as well as penalties for his employer's alleged arbitrary and capricious failure to pay said benefits. On May 15, 1987, NOPSI answered the petition and filed an exception of prematurity asserting that Mr. Daniel had not actually filed a claim with the OWC for either the May 27th accident or the July 30th accident. On May 29, 1987, Mr. Daniel filed a claim form referencing those two accidents. On June 29, 1987, the OWC issued a new recommendation with regard to the July 30th accident, finding that no temporary total disability benefits were owed Mr. Daniel but that his related medical expenses should be paid. NOPSI's exception of prematurity was apparently never pursued.[4]
On February 3, 1995, during the pendency of this litigation, Mr. Daniel died, and his daughter was then substituted as plaintiff.[5] A bench trial was held in the district court[6] on June 18-21, 2001. On May 6, 2002, the trial court rendered judgment in favor of NOPSI, dismissing the plaintiff's claim with prejudice. In brief Reasons for Judgment, the trial court found that NOPSI was justified in withholding benefits because: "There was no contemporaneous medical information from a physician indicating that the plaintiff's back or head problems were due to a work related accident. From what [NOPSI] knew at the time, Mr. Daniel was not entitled to benefits."
On appeal, the plaintiff argues the trial court erred by concluding that the employee, Mr. Daniel, failed to establish the existence of a work related disability. Included in this argument by the plaintiff are specific assertions that the trial court erred by failing to award benefits pursuant to the October 30, 1986 recommendation of the Office of Workers' Compensation ["OWC"], which the plaintiff contends NOPSI was conclusively presumed to have accepted, and that the trial court erred by declining to apply the "odd lot" doctrine. Finally, the plaintiff contends that the trial court should have assessed statutory penalties against NOPSI for its allegedly arbitrary *725 and capricious refusal to pay benefits to Mr. Daniel.

DISCUSSION OF LAW
Workers' compensation cases are reviewed according to the "manifest error clearly wrong" standard, which precludes the setting aside of the trial court's findings of fact unless they are clearly wrong in light of the record viewed in its entirety. Alexander v. Pellerin Marble & Granite, 93-1698 (La.1/14/94), 630 So.2d 706, 710. This standard applies particularly where there are credibility determinations involved. Owens v. Georgia Pacific Corp., 535 So.2d 990, 993 (La.App. 2d Cir.1988). However, the manifest error standard also applies in cases where the evidence before the trier of fact consists primarily or solely of written reports, documentary records and depositions. Alexander v. Pellerin Marble & Granite, supra, at 710.
In order to recover, the claimant in a workers' compensation case must prove: (1) a [work related] accident; (2) a disability; and (3) a causal connection between the accident and the disability. Marks v. Pride Aviation, Inc., 95-971, p. 2 (La.App. 3 Cir. 1/31/96), 670 So.2d 376, 377. In the instant case, it is undisputed that Mr. Daniel had three work related accidents, which together form the basis for this lawsuit; the issue at trial was whether any of these accidents rendered him totally disabled.[7]
The Louisiana Workers' Compensation Act ["the Act"] in effect at the time of the claimant's injuries is controlling. See Menard v. Winn Dixie Louisiana, Inc., 93-1497, p. 10 (La.App. 3 Cir. 6/1/94), 640 So.2d 775, 781. At the time of Mr. Daniel's accidents in 1986, La. R.S. 23:1221(2)(c) provided, in pertinent part:
... [C]ompensation for permanent total disability shall be awarded only if the employee proves by clear and convincing evidence, unaided by any presumption of disability, that the employee is physically unable to engage in any employment or self-employment, regardless of the nature or character of the employment or self-employment, including, but not limited to, any and all odd-lot employment, sheltered employment, or employment while working in any pain, notwithstanding the location or availability of any such employment or self-employment.
LA.REV.STAT. ANN. § 23:1221(West 1998) (emphasis added).[8]
Pursuant to this statute, even if a worker seeking permanent total disability is in pain, he must work unless he proves by clear and convincing evidence that he is physically unable to engage in any type of employment whatsoever, including self-employment. Thomas v. Union Tank Co., 94-778, pp. 7-8 (La.App. 3 Cir. 12/7/94), 647 So.2d 581, 586-587. According to the jurisprudence, to prove a matter by clear and convincing evidence means to demonstrate that the existence of a disputed fact is highly probable; that is, much more probable than its nonexistence. Johnson v. Temple-Inland, 95-948, pp. 6-7 (La. App 3 Cir. 1/31/96), 670 So.2d 388, 392; Hagan v. LSU Medical Center, 28,669, p. 6 (La.App. 2 Cir. 9/27/96), 681 So.2d 971, 975. The clear and convincing standard is *726 a heavier burden of proof than the usual civil preponderance of the evidence standard but less burdensome than the beyond a reasonable doubt standard used in criminal law. Johnson, supra, p. 6, 670 So.2d at 392. To carry the burden of proving disability by clear and convincing evidence, a workers' compensation claimant must present objective medical evidence. Cormier v. Resthaven Nursing Home, 95,230, p. 5 (La.App. 3 Cir. 1/17/96), 670 So.2d 233, 237.
In addition, with regard to permanent total disability, the Act provides (and has so provided since 1916) that no compensation is to be paid for the claimant's first week of disability unless the disability continues for at least six weeks from the date of the accident, at which time compensation for the first week becomes due. LA. REV.STAT. ANN. § 23:1224 (West 1998). Therefore, Louisiana courts have denied compensation benefits when the claimant has not missed more than seven consecutive days of work. Owens v. Georgia Pacific Corp., supra, 535 So.2d at 994.
In the instant case, the records introduced at trial show clearly that Mr. Daniel did not miss seven consecutive days of work as a result of either of his first two accidents[9], although he did have an extensive number of half days and time missed during the day to attend doctor's appointments. Plaintiff alleged that NOPSI manipulated its records by reporting some of Mr. Daniel's time off as regular sick leave or vacation time, but plaintiff failed to introduce any evidence at trial to support this allegation. Accordingly, the issue on appeal is whether the trial court was clearly wrong in determining that Mr. Daniel did not become disabled after the third accident on July 30, 1986, either as a result of that accident or of the three accidents in combination.

DISCUSSION OF THE EVIDENCE
In the instant case, lay witnesses included Mr. Daniel's daughter and stepson, and various NOPSI management personnel. The bulk of the evidence, however, was medical, with four physicians testifying and the reports, records, and/or depositions of at least nine other physicians introduced at trial.
The physician who saw Mr. Daniels the most frequently during the relevant time period was Dr. Robert Segura, who was qualified at trial as a specialist in industrial medicine. Beginning on January 30, 1986 (the day after Mr. Daniel's first accident) and concluding on July 30, 1986 (the afternoon of the third accident), Dr. Segura treated Mr. Daniel approximately fifteen times for head, neck, and/or back pain[10], but on each occasion he released Mr. Daniel to regular or modified duty; he never found that Mr. Daniel was completely unable to work. Dr. Segura's initial diagnosis after the January 29th incident was a scalp contusion with resulting posterior traumatic headaches. He ordered an EEG, the result of which was normal. Dr. Segura testified at trial that a post-concussion syndrome generally lasts for ten days to two weeks. He opined that Mr. Daniel's headaches, which persisted beyond this time, could have resulted from many factors, including his hypertension, inner ear problems related to his prior mastoidectomy, and/or sinus problems.
In late February, Dr. Segura referred Mr. Daniel to a neurologist, Dr. Wendy *727 Jamison. Mr. Daniel saw Dr. Jamison on February 27th and March 6th; Dr. Jamison diagnosed him with post-traumatic headaches and ordered a CT scan to rule out a subdural hematoma, or bleeding in the brain. The CT scan came back within normal limits. Dr. Jamison testified at trial that she did not believe Mr. Daniel had a brain injury, but believed his headaches and dizziness were related to his prior history, particularly the mastiodectomy of the left ear, which can cause balance problems. She also noted that Mr. Daniel had been involved in several car accidents, that he drank beer heavily and was on numerous medications. Dr. Jamison did not find Mr. Daniel to be disabled.
During approximately the same time period, Mr. Daniel was seen by two ear, nose and throat specialists, Dr. Gerald Vocke and Mr. Daniel's own personal physician, Dr. Norma Kearby. Both noted that Mr. Daniel still had some inner ear problems due to the matiodectomy of the left ear he had undergone several years prior. After ruling out sinus problems and finding no other objective evidence to support Mr. Daniel's complaints, both doctors suggested Mr. Daniel's headaches and dizziness could be attributable to a post-concussion syndrome; neither, however, found Mr. Daniel to be disabled.
In May of 1986, NOPSI sent Mr. Daniel to see another neurologist, Dr. Susan Boston. Dr. Boston reported no objective findings to explain Mr. Daniel's symptoms, and she did not find him to be disabled. At about the same time, Mr. Daniel underwent a psychological evaluation by Dr. Stanley Roskind, which also turned up no evidence of a psychological component to his pain.
Following Mr. Daniel's second accident on May 27th, in which he allegedly injured his back while installing pipe, he was seen by Dr. Gernon Brown, an orthopedist. Mr. Daniel was complaining of low back pain, discomfort in his neck, and occasional numbness in his lower extremities. He also told Dr. Brown that he had sustained two prior injuries to his back, one in 1969 and one in 1979. Dr. Brown's examination revealed complete motion of the cervical spine, lumbar spine, upper and lower extremities; no spasm of the neck musculature; normal volume of tone in the musculature of the upper and lower extremities; and normal sensation and circulation. Dr. Brown noted that Mr. Daniel's records showed he had degenerative arthritis in his lumbar spine. After taking x-rays, Dr. Brown concluded Mr. Daniel had degenerative disc disease, which could cause recurrent back pain, but found no evidence of an acute or recent injury. He did not find Mr. Daniel unable to work.
In July, 1986, Mr. Daniel underwent a psychiatric evaluation by Dr. Greg Khoury. He did not find any pathology that would prevent Mr. Daniel from performing his full work responsibilities. Dr. Khoury referred Mr. Daniel to a neurologist, Dr. Walt Truax, who ran a program at JoEllen Smith Hospital. Mr. Daniel apparently completed the program. Dr. Truax's July 9, 1986 consultation notes reflect his belief that Mr. Daniel's headaches and low back pain were "real," but he did not consider Mr. Daniel to be disabled neurologically at that time. Dr. Khoury's July 24, 1986 report to NOPSI also related that Mr. Daniel was suffering from post-concussive syndrome, which was not disabling.
Mr. Daniel suffered his third accident on July 30th, a slip and fall during which he allegedly re-injured his back. He saw Dr. Segura that afternoon, who did not find any evidence of a new injury but did note that Mr. Daniel was suffering from "pre-existing lumbosacral degenerative disc disease." *728 Dr. Segura again cleared Mr. Daniel to return to regular duty that same day.
In September, 1986, after Mr. Daniel had not worked for about a month, Dr. Felix Rabito, a cardiologist, executed a non-occupational disability form for purposes of Mr. Daniel's long-term disability claim, which form indicated that Mr. Daniel was totally disabled due to chronic low back pain from lumbar disc syndrome. On September 5, 1986, Mr. Daniel wrote a letter to Mr. Charles Wild of NOPSI stating Mr. Daniel's belief that his disability was the result of his January 29, 1986 accident, which aggravated a pre-existing back injury he had incurred while working for NOSI in 1979. In his report dated October 9, 1986, Dr. Rabito stated that he had treated Mr. Daniels intermittently since 1976 for hypertension. Dr. Rabito opined in that report that Mr. Daniel had suffered an acute cervical strain and concussion on January 29, 1986, and had "subsequently injured what has been a chronic back." He concluded that Mr. Daniel was suffering from lumbar disc syndrome and was "not physically fit to return to his former occupation now or in the near future."
Approximately one year later, in August, 1987, Mr. Daniels consulted a neurosurgeon of his own choosing, Dr. Edward Connolly, about his back and head pain. Mr. Daniel informed Dr. Connolly that he had suffered a work related accident in January of 1986. Dr. Connolly reviewed Mr. Daniels' previous medical records and performed an MRI of his back and neck, as well as a complete clinical examination. He opined that Mr. Daniel had degenerative disc disease and that his pain was due to muscle tension headaches or hypertension. He did not state that Mr. Daniel was incapable of working.
At trial, plaintiff presented the testimony of Dr. Charles April, a radiologist who specializes in diagnostic studies of the spine. By reviewing and comparing a CT scan of Mr. Daniel's spine done in 1984 and the 1987 MRI ordered by Dr. Connolly, Dr. April testified that the degeneration at the L3-4 and L4-5 levels had probably occurred between March of 1984 and September of 1987. He based his opinion on the fact that the 1984 scan showed those discs to be normal and the 1987 test showed evidence of "recent" degeneration. He also testified that the more advanced degeneration at the L5-S1 level had begun before 1984. He stated that all disc degeneration is caused by trauma, which could be a single episode of major trauma or the multiple minor traumas of a lifetime, also referred to as age-related wear and tear. Dr. April admitted that he could not say without a doubt what type of trauma had caused the disc pathology in Mr. Daniel's spine. The trial court would not allow Dr. April to give an opinion as to the probable cause, ruling that causation was outside his expertise.
Psychiatrist Dr. Greg Khoury, who had examined Mr. Daniel in July of 1986, also testified at trial for the plaintiff. At trial, he stated that he could not recall having been given any of Mr. Daniel's prior medical records at the time of his 1986 examination. Prior to trial, Dr. Khoury reviewed not only those records, but also Mr. Daniel's entire medical history. Those documents included Charity Hospital records showing that approximately two years after his termination by NOPSI, Mr. Daniel was hospitalized for a psychiatric condition described as major depression with a paranoid psychosis. Dr. Khoury opined that Mr. Daniel's January 29, 1986 head injury, which resulted in a post-traumatic concussion, was also a "causative element" in bringing about his eventual psychiatric illness.

*729 ANALYSIS

The plaintiff's burden was to establish by clear and convincing evidence that Mr. Daniel was physically unable to engage in any type of employment as a result of a work related injury. Reviewing the medical evidence, we note that of numerous physicians whose opinions were considered by the trial court, only one, Dr. Rabito, believed Mr. Daniel to be physically disabled. Dr. Rabito, who is not a back specialist but a cardiologist, opined that Mr. Daniel was disabled due to aggravation of a chronic back condition allegedly caused by the first accident, which involved a piece of tubing that fell and struck Mr. Daniel in the head. Dr. Rabito did not testify at trial, however. From the documentary evidence attributable to him, it is not clear whether he considered Mr. Daniel to be disabled from his occupation as a welder or from any occupation whatsoever. In any case, the trial court could have reasonably believed that the opinions of the other medical experts outweighed that of Dr. Rabito. The only other expert testimony linking the accidents to a disability was Dr. Khoury's opinion that Mr. Daniel's eventual psychiatric collapse was triggered by the first accident years earlier; however, as we noted, the Act requires that the claimant be physically disabled to receive permanent total disability benefits.
In view of the evidence, we cannot find that the trial court committed manifest error in holding that the plaintiff failed to prove Mr. Daniel was totally disabled as a result of a work related injury. Where the evidence of experts differs, it is the responsibility of the finder of fact to determine which expert is most credible, and that determination will not be disturbed upon appeal so long as it is reasonable. Angulo v. ATH Painters and Construction, Inc., 98-2363, p. 8 (La.App. 4 Cir.5/5/99), 733 So.2d 1222, 1226. In cases such as the instant one, where all or a majority of the doctors who examined the claimant released him to return to work, the appellate courts have generally affirmed the trial court's finding of no disability. See, e.g.: Broussard v. Grey Wolf Drilling Co., 562 So.2d 1006 (La.App. 3d Cir.1990); Williams v. Hospital Service, Inc., 95-214 (La.App. 5 Cir. 9/20/95), 663 So.2d 749. Similarly, in the instant record, we do not find clear and convincing evidence that Mr. Daniel was completely disabled as a result of a work related injury.
Nor are we convinced by plaintiff's alternative legal arguments. Plaintiff's contention that NOPSI was conclusively presumed to have accepted the first OWC recommendation regarding the July 30th accident is not persuasive.[11] We agree with NOPSI that the recommendation was defective because of the absence from the record of a formal claim (referencing the July 30th incident) that predated the first recommendation.[12] Moreover, NOPSI proved at trial that it did not receive the recommendation and therefore could not have responded to it timely. NOPSI's version of the facts is further supported by the OWC's issuance of a second recommendation upon the filing of a formal claim by Mr. Daniel; generally, a second recommendation would be issued only in response to one party's request for modification.
*730 Additionally, plaintiff's contention that the trial court should have considered the odd lot doctrine has no merit. The legislature expressly abrogated the use of this jurisprudentially created doctrine in the 1983 amendment to the Act, which became effective before Mr. Daniel's first accident.[13]
Finally, our affirming of the trial court's finding on the issue of disability moots consideration of the plaintiff's contention that NOPSI should be penalized for arbitrarily and capriciously denying benefits. The record clearly shows that based on the information NOPSI had available to it at the time, there existed a reasonable basis for NOPSI's rejection of the disability claim.

CONCLUSION
Accordingly, for the reasons stated, the judgment of the trial court is affirmed.
AFFIRMED.
NOTES
[1] This information is taken from the Statement of Uncontested Facts attached to the Motion for Summary Judgment filed by the plaintiff on July 20, 2000. The motion was apparently never pursued.
[2] The complaint form, introduced as evidence at trial, does not mention either the May 27th accident or the July 30th accident.
[3] Although the formal recommendations recite that the OWC received complaints regarding these accidents at the same time it received the first complaint, no such complaint forms were introduced at trial. Evidence at trial indicated that the OWC learned about the two subsequent accidents through medical reports it received and/or telephone conversations with NOPSI management personnel.
[4] Plaintiff's action was dismissed as abandoned in 1992. However, the district court subsequently vacated its dismissal on the ground that Mr. Daniel's debilitating mental illness had made it impossible for him to act on his own behalf. This court affirmed the reinstatement of the case on March 26, 1993, and the Louisiana Supreme Court denied writs on June 4, 1993.
[5] There is no allegation that Mr. Daniel's death was related to the accidents for which the plaintiff now seeks workers' compensation.
[6] In 1988, the Louisiana Legislature established administrative hearing officer positions under the Director of the OWC and gave the hearing officers original jurisdiction over workers' compensation disputes. See generally 1988 La. Acts No. 938. However, Act 260 of 1989 delayed the implementation dates of the administrative hearing officer provisions and specifically provided that all unresolved claims filed prior to Jan. 1, 1990, were to be resolved by the procedures in effect prior to the 1988/1989 amendments. See 1989 La. Acts No. 260, § 4(c). Accordingly, the instant case was tried by the district court rather than by the workers' compensation court.
[7] The record shows that NOPSI paid Mr. Daniel's medical expenses related to the three accidents through approximately the time of the termination of his employment.
[8] This section has been in effect since 1983, when the Act was amended to provide that the burden of proof in permanent total disability cases is by clear and convincing evidence. See 1983 La. Acts (1st Ex.Sess.) No. 1, § 1 (eff. July 1, 1983). A similar amendment of La. R.S. 23:1221(1)(c) in 1989 provided for the same burden of proof in temporary total disability cases. See 1989 La. Acts No. 454, § 6 (eff. Jan. 1, 1990.)
[9] This fact was the basis of the OWC's recommendations that no weekly benefits were owed for the January 29th or the May 27th incident.
[10] Once in May, 1986, Mr. Daniel was seen by Dr. Paul Naccari, an associate of Dr. Segura, in Dr. Segura's absence.
[11] See La. R.S. 23:1331 (from 1983 La. Acts (1st Ex.Sess.) No. 1), repealed by 1988 La. Acts No. 938 (eff. Jan. 1, 1990).
[12] At the relevant time, La. R.S. 23:1310 (from 1983 La. Acts (1st Ex.Sess.) No. 1) required the filing of a claim form setting forth the "time, place, nature, and cause of the injury."
[13] See La.Rev.Stat. Ann. § 23:1221(2)(c) (West 1998), quoted infra; Henton v. Walker & Wells Contractors Inc., 25-821 (La.App. 2 Cir. 5/4/94), 637 So.2d 672.